**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AUSTIN POWDER COMPANY, Respondent.**

No. 15620.

United States Court of Appeals Sixth Circuit.

Sept. 22, 1965.

Vivian Asplund, N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., N. L. R. B., Washington, D. C., on brief, for petitioner.

Roderick C. Hunsaker, Cleveland, Ohio, and Arthur R. Donovan, Evansville, Ind., for respondent.

Before WEICK, Chief Judge, EDWARDS, Circuit Judge and McCREE, District Judge.

McCREE, District Judge.

The National Labor Relations Board here petitions for enforcement of an order finding respondent, Austin Powder Company, guilty of committing unfair labor practices in violation of Sections 8 (a) (1), 8(a) (3), and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), (3), and (5).[1] The Board's order directs respondent to cease and desist from infringing employees' rights of self-organization, to bargain collectively with Local Union No. 215, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter "the union"), and to reinstate with back pay six employees found to have been discharged unlawfully.

Respondent (hereinafter "the company") is engaged in the manufacture and distribution of explosives and the retail sale of mine and mill supplies. It operates a number of plants in the south and midwest. The instant case involves the company's so-called Western Kentucky Division, which embraces (1) a plant in Carrier Mills, Illinois, which manufactures explosives, (2) another such plant near Madisonville, Kentucky, situated about 75 miles from the Illinois plant, and (3) a combined warehouse and retail store in Madisonville proper, which deals in mine and mill supplies other than explosives, and is located about six miles from the above-mentioned Madisonville manufacturing plant.

The relevant facts as found by the Board are these: Between March 17 and 26, 1962, Frederick, a Madisonville plant employee, solicited his fellow employees at the plant and at the warehouse to sign union authorization cards. Having obtained twelve signatures among twenty-one employees by March 26, the union on that date sent a letter to the company demanding recognition as the bargaining representative of employees at the "Madisonvillle establishment." This letter was received on March 27 by Thomas G. King, respondent's district manager. On the same day, company supervisors solicited employees to sign the following statement:

"I hereby certify that I am not a member of Chauffeurs and Teamsters Local 215 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and that I have not chosen said union as my bargaining representative as your employee."

On the evening of March 27, King telephoned a plant production worker, Opal Frye, and asked her about the "trouble at the plant," whether she knew who was "the head of the union movement," "how long it had been brewing," and with whom he could talk "to get it stopped." Frye testified that when she professed ignorance, King told her, "As for your job, we made your job for you, we don't need you tomorrow." A somewhat dif-

---

1. Sec. 8(a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
    (3) by discrimination in regard to hire or tenure of employment to en-courage or discourage membership in any labor organization;
    (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).

ferent version of the conversation was related by King, but the trial examiner and the Board chose to credit Frye's testimony.

On March 28, King called a meeting attended by seventeen employees. At the outset Frederick got into a dispute with King, during the course of which King said that he had been advised by the company "to operate as is" if he could, and if he could not, he "would have to put a lock on the gate." In protest, Frederick reportedly declared either that all those who were "with me" or who were "for the union" should "follow me out the door." Thereupon eleven employees, including Frederick, left the meeting

On March 29, the union filed with the National Labor Relations Board a petition for a representation election among the company's Madisonville employees. On March 30, apparently before receiving notice of the petition, the company rejected the union's demand for recognition, professing doubt as to its majority status and as to the appropriateness of the claimed unit, and suggesting resort to the Board. On March 31, King posted a notice on one or more of the company's bulletin boards which informed the employees of the union's bargaining demand and of the company's rejection thereof because of doubts as to majority status and proper unit. The notice, which remained posted until August 28, also stated:

> "The Company wishes to inform you at this time that each and every employee has a right:
>
> 1. To join a union, or
>
> 2. Not to join a union.
>
> The choice is entirely up to each and every employee. This Company will not interfere [sic] or coerce or intimidate any employee in the exercise of the above rights.

> There seems to be some misunderstanding as to whether or not the Company has interfered with these rights. We do not think we have interfered, however, so that there will be no misunderstanding, we again assure you that any action or statement by the Company which would lead you to believe that you do not have the right to join or to refrain from joining a union is hereby withdrawn and cancelled.

> Again we repeat, each and every employee has a right to join or refrain from joining a union, and if any agent, supervisor or executive of this Company should tell you that you cannot exercise such rights, please contact the writer immediately."

Thereafter, between April 10 and May 8 (and prior to the hearing on the union's representation petition), the company notified seven employees that they were being "permanently laid off." None of them has since been called back to work. Of these seven, all but one (Marks, the newest of the Madisonville employees) had signed union cards and one of them, Frederick, was the leader of the union movement. These six were among the eleven employees who had walked out of the March 28 meeting called by King, and three of the six had been asked to sign the statement disavowing the union and had refused.

I

Regarding the instant charges of unfair labor practices, the Board found three violations of 8(a) (1) by the company, viz.: the King-Frye conversation, the March 27 solicitation of employees to sign a statement repudiating the union, and the declaration of King at the March 28 assembly that the plant would be closed if it could not be operated "as is." The company contends that neither King's statements to Frye nor to the assembled employees were intimidating. That, however, is a matter of inference to be drawn from the facts. We cannot say that the Board acted unreasonably in considering King's statements to be veiled threats of reprisal in the event of unionization. Nor did the Board exceed its authority in rejecting the company's claim that it was engaging in permissible inquiry when it sought disclaimers of union adherence

from its employees, because the disavowal petition goes far beyond mere interrogation and, in addition, the company's solicitations occurred in the context of other coercive acts.

■ Respondent insists, however, that any 8(a) (1) violations with which it might be chargeable were effectively neutralized by its posted notice of March 31, advising employees of their statutory rights. The Board found the notice inadequate to dispel prior coercion because it doubted that the notice was "sufficiently unambiguous" or adequately publicized, and because the notice itself was vitiated by further violations of the Act. Cf. National Labor Relations Board v. Wagner Iron Works, 220 F.2d 126, 138 (7th Cir. 1955). An assessment as to the probable effect of employer conduct upon the exercise of employees' statutory rights is involved here as it is involved in the initial finding of 8(a) (1) violations, and once again the Court does not find the Board's conclusion so wanting in rational basis as to require or permit reversal.

## II

With respect to the "permanent layoffs" of six union adherents, the trial examiner found that the company had economic justification for reducing its work force, but further found that the employees selected for termination were chosen on a discriminatory basis. The Board rejected the examiner's first finding and refrained from passing on the second. In the Board's view, a "strong prima facie case" of 8(a) (3) violation was presented by (1) the company's knowledge of union organizational activity, (2) the timing of the layoffs, which occurred during the pendency of representation proceedings before the Board, and (3) the company's demonstrated hostility to the union. Nor were the company's proofs regarded as sufficient to overcome the prima facie case thus made. Although the company established that its Madisonville production had declined by 25 percent in the second quarter of 1962 and that no replacements were hired or overtime worked after the layoffs in question, the Board rejected the asserted business justification, principally on the ground that the decision to reduce the work force was made and executed before the second quarter production figures were compiled.

■■ If the Board's determination is supported by substantial evidence on the record viewed as a whole, the duty of this court plainly is to accept that determination. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The difficulty here is that on close scrutiny the Board's finding is equivocal. If by lack of "economic justification" the Board meant to suggest that there had been an insufficient showing of legitimate business reasons for the company to reduce its Madisonville staff, its conclusion lacks the requisite evidentiary support. The decline in second quarter production is undisputed, as is the evidence indicating that the prospects for an upswing were bleak. The fact that exact production figures were unavailable when the decision to eliminate seven employees was made does not neutralize the company's claim, since the substantial drop in production was apparent even before it was formally documented.

Yet another construction might be placed on the Board's finding. It is possible that the Board used the phrase "economic justification" in the sense of *motivation*. That is to say, the Board may have concluded that whatever legitimate business considerations might have existed which would have warranted layoffs, the actual motivation for the company's decision was its desire to undermine the union majority. Thus the precipitating cause, but for which layoffs would not have been made or would have been postponed, was the company's hostility to the union and nothing else.[2] Cf. N. L. R. B. v. Brown, 380 U.S. 278, 85

2. Such a finding would seem to subsume the examiner's second holding, left open by the Board, that the choice of employees to be terminated was discriminatory.

S.Ct. 980, 13 L.Ed.2d 839 (1965), American Ship Building Co., v. N. L. R. B., 380 U.S. 300, 313, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). We need not consider now whether the record discloses substantial evidence to support a finding of unlawful motivation on the part of the employer. In view of our uncertainty as to what it is that the Board decided, our proper course is to deny enforcement of the reinstatement provision of the Board's order pending remand to the Board for clarification. See N. L. R. B. v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061 13 L.Ed.2d 951 (1965). As Mr. Justice Cardozo said:

> "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." United States v. Chicago, M., St. P. & P. R. R., 294 U.S. 499, 510–511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935).

### III

The Board also found that respondent had wrongfully refused to recognize or bargain with the union, in violation of sections 8(a) (5) and (1) of the Act. As of March 26, 1962, the date of the union's demand for recognition, the union represented at least eleven of twenty employees in the unit determined by the Board to be appropriate.[3] The "doubts" which the company claimed to have harbored regarding the appropriateness of the unit sought by the union were dismissed as a sham. The Board found that respondent's refusal to bargain was not in fact motivated by any such doubts but "by a rejection of the principle of collective bargaining, and by a desire to gain time in which to undermine the union." This conclusion was based on the company's "shifting and sharply divergent unit contentions,"[4] the "coercive conduct * * * which followed on the heels of the union's demand of March 26," the rejection of the union's offer to prove its majority status by submission of authorization cards to the company,[5] and the demonstration of union support among a majority of employees evidenced by the protest walkout of eleven employees from the assembly called by King. The foregoing facts, established by substantial evidence, permit the inference that respondent's professed doubts were not the reason for its refusal to bargain.

The contentions that the unit description in the union's initial demand for recognition was ambiguous or that the company could reasonably have believed that an alternative unit including the Carrier Mills plant was more appropriate are beside the point. Even if accepted, these contentions establish only that there may have been reasonable grounds for rejecting the union's demand (a matter as to which we express no opinion), but they do not meet the Board's finding that the real basis for the company's actions was not doubt, however reasonable, but a desire to stifle the union.

For the reasons stated, the order of the Board will be enforced with the exception of the reinstatement provision, as to which the case is remanded to the Board for further proceedings consistent herewith.

---

3. "All production, maintenance and warehouse employees at the Respondent's operations in the Madisonville, Kentucky, area, including truckdrivers and plant clerks, but excluding office clerks, professional employees, guards and supervisors, as defined in the Act."

4. For example, in the abortive representation proceedings the company did not contest the appropriateness of the unit sought, but before the trial examiner hearing the unfair labor practices charges, the company variously contended that the warehouse and the plant in Madisonville were separate units and that the company's entire Western Kentucky Division, including the Carrier Mills, Illinois, plant, constituted a single unit.

5. Even on the basis of the company's claim that the warehouse and the plant were separate units, the union could have proved its majority status in each if given the opportunity to do so.