390 F.2d 846
 129 U.S.App.D.C. 80
 UNITED STEELWORKERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Roanoke Iron &
Bridge Works, Inc., Intervenor.
ROANOKE IRON & BRIDGE WORKS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent. United
Steelworkers of America,AFL-CIO, Intervenor.
 Nos. 20336, 20514.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 16, 1967.
Decided Dec. 27, 1967, As Amended April 26, 1968, Certiorari
Denied May 6,1968, See 88 S.Ct. 1654.
 
 Mr. Michael Gottesman, Washington, D.C., with whom Mr. Elliot Bredhoff, Washington, D.C., was on the brief, for petitioner in No. 20,336 and intervenor in No. 20,514.
 Mr. Robert D. Douglas, Jr., Greensboro, N.C., of the bar of the Supreme Court of North Carolina, pro hac vice, by special leave of court, with whom Messrs. Bartholomew A. Diggins and Daniel W. Sixbey, Washington, D.C., were on the brief, for petitioner in No. 20,514 and intervenor in No. 20,336.
 Mr. Glen M. Bendixsen, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Burton L. Raimi, Attorney, National Labor Relations Board, were on the brief, for respondent.
 Before BURGER, LEVENTHAL and ROBINSON, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 The National Labor Relations Board (Board) concluded that the Roanoke Iron & Bridge Works (Company) violated Section 8(a)(5) of the National Labor Relations Act,[1] by virtue of its conduct during the period of negotiations between October 1964 and October 1965 with the United Steelworkers of America, AFL-CIO (Union), which had been duly certified by the Board following a 97 to 26 vote in a representation election of September 7, 1964. We affirm the Board's order, rejecting attacks by both the Union and the Company.
 
 
 2
 I. Substantial Evidence Supporting the Board's Finding That Company's Negotiations on Checkoff Issue Were Not in Good Faith.
 
 
 3
 In our view there was substantial evidence supporting the Board's critical finding that the Company did not bargain in good faith on the checkoff issue.
 
 
 4
 The backgound evidence reaches back to 1951, when the Union, after election and certification, entered into a collective bargaining agreement with the Company. At that time the Company rejected the Union's request for a voluntary checkoff (a system by which the Company pays directly to the Union the dues of those employees who consent to such deductions from their paychecks). By the time the 1951 contract expired, the Union had lost its majority status.
 
 
 5
 In 1961 the Company bargained with a different certified employee representative-- the Steel Fabricators Union of Roanoke, Virginia, a local organization composed wholly of Company employees. The Steel Fabricators also requested a checkoff, claiming in support of it that without some Company cooperation in dues collection that union could not survive. Initially the Company took the same position adverse to the checkoff that it had assumed a decade earlier. But it discontinued its seemingly steadfast opposition to participation in dues collection, and decided to help the Steel Fabricators by granting the checkoff. However, by the time the 1961 contract had expired so had the local union.
 
 
 6
 When the Union, early in 1964, sought to resume as bargaining tepresentative of the Roanoke employees the Company offered vigorous opposition. The Company peppered its election propaganda with copious allusions to the Union's prior activity at the plant. In a letter of July 1, the Company boasted that because a checkoff had not been granted in 1951, the Union had been forced to abandon the Roanoke plant. The Company's letter of August 13, 1964, reiterated that in 1951 'we drew the line at collecting Union dues out of your pay check,' adding: 'Within a few months, many employees stopped paying the Union any money, when they found out they did not need a Union, and when the contract ran out, the Union pulled out and left us.' On September 1, 1964, a week before the election, the Company stated that the primary reason for the Union's organizational efforts at Roanoke was to fatten its coffers. The Company's letter the following day contained questions-and-answers on contract checkoffs that reflected its opposition to them.
 
 
 7
 Against this background bargaining began in October 1964. In March 1965, after 12 or 13 meetings, the Union called a strike which lasted until the fall. Another 12 or 13 bargaining sessions were held during the strike. A primary subject of discussion at each of the 25 bargaining sessions, and a primary cause of the strike, was the Union's demand that the contract contain a provision for voluntary checkoff or other means of facilitating collection of union dues and the Company's refusal to grant this demand. The Union offered and the Company rejected seven alternative dues collection schemes to voluntary checkoff. The strike ended with an agreement that was silent on checkoff, without prejudice to the Union's urgaing to the Board that the Company had violated the Act by refusing to bargain in good faith on the checkoff.
 
 
 8
 In opposing the checkoff the Company reverted to the same reason it had offered in 1951, namely, that as a metter of 'principle' no cooperation on dues collection would be given. But the Board found it had negotiated in bad faith. We repeat verbatim, without attempt at paraphrase, the critical findings on bad faith which appear in a concluding section of the Examiner's decision duly adopted by the Board:
 
 
 9
 I find that the Company did not bargain in good faith on the checkoff issue. Long before the outset of negotiations the Company equated the checkoff with the Union's survival. Company campaign literature emphasized that the Union had disappeared from the scene in 1952 because of the failure to obtain a checkoff. Similarly in 1961 the Company gave a checkoff to the Company union because the Company believed that the checkoff was necessary to that union's survival. In the 1965 negotiations with the Union, the Company's opposition to a checkoff was not based on the cost or inconvenience to the Company (it expressly disclaimed such factors) but allegedly on the 'principle' that collection of union dues was union business. The Company departed from this principle in 1961; this alone would not establish bad faith. But the reason assigned for the 1961 'departure' and the 1964 campaign literature lead me to find that the alleged 'principle' was grounded in the Company's belief that if it refused the checkoff the Union would suffer and would probably again leave the scene.
 
 
 10
 The evidence amply permits the inference that the Company's bargaining stance was adopted in order that the Union's status as bargaining representative, which it had unsuccessfully resisted in the election campaign, might be weakened and destroyed.
 
 
 11
 The Examiner and the Board concluded that no one of the facts relied on was sufficient in itself as the predicate for a finding that the Company's position on the checkoff was motivated by bad faith. Considering the facts cumulatively, however, the Board found bad faith and we cannot hold that the finding was unreasonable.
 
 
 12
 II. Validity of Board's Conclusion That Such Negotiations Violated Company's Statutory Duty.
 
 
 13
 The Company's contention that the Board's order must be set aside rests essentially on a supposition that as a matter of law the Company's conduct was permissible and could not be condemned.
 
 
 14
 The Examiner's opinion provides this capsule of the Board's legal premise-- that 'if a party at the bargaining table espouses a position for the purpose of destroying or even crippling the other party to the negotiations, he has not bargained in good faith as required by the Act.' We approve this construction of the statute.
 
 
 15
 Section 8(d) of the Act, which expressly requires the parties to meet 'and confer in good faith with respect to * * * terms and conditions of employment,' establishes a duty that is a salient and integral part of the duty 'to bargain collectively' set forth in 8(a)(5).[2] The subject of dues checkoff is a mandatory subject of bargaining[3] under 8(a)(5) and 8(d), and the Company does not contend to the contrary. In another phrase 8(d) provides that the statutory duty does not compel a party 'to agree to a proposal or require the making of a concession.' However this qualification does not permit an employer-- by a mere claim that it was only engaged in 'hard bargaining' on the checkoff-- to escape condemnation when it has refused to bargain in good faith. This proposition is clear enough when the party's good faith is negatived by its purpose to frustrate any agreement whatever.[4] We think it is equally clear that a company (or union) may not assume an intransigent position in bad faith on a mandatory subject of bargaining even though its purpose to frustrate an agreement on that issue coincides with a willingness to reach some overall agreement. This follows from NLRB v. Katz,369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), holding that the Act condemns a refusal to negotiate in fact about a mandatory subject even though the employer in good faith desires some overall agreement.
 
 
 16
 The Company's purpose to avoid an agreement on one issue is not necessarily bad faith, as is plain from the provision of 8(d) already quoted. But the Company is mistaken in supposing that it is immune from condemnation for bad faith merely because it defines its immediate bargaining tactic as the refusal to agree on one issue.
 
 
 17
 The crucial question, whether a party has met its statutory obligation to bargain in good faith, typically turns on the facts of the individual case.[5] The significance of those facts is properly assessed in the light of the various statutory provisions and their purpose.
 
 
 18
 Section 8(a)(5) has the significant purpose of fostering collective bargaining agreements, employing as the means to accomplish this object the requirement that the parties honestly attempt to reach an accord. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). 'While Congress did not compel agreement between employers and bargaining representatives, it did require collective bargaining in the hope that agreements would result. * * * Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims.' 351 U.S. at 152, 76 S.Ct. at 755.
 
 
 19
 The determination and proper application of 8(a)(5) is illuminated by the objective of this and the other unfair labor practice provisions of providing means to the end of promoting industrial stability in the labor management area. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 42, 57 S.Ct. 615, 81 L.Ed. 893 (1937).
 
 
 20
 At the heart of the Act is the basic directive that management recognize the employee representative.[6] This is a crucial, pervasive mandate woven throughout the pattern of the Act and the varying obligations imposed by Congress. In an election context, 8(a)(1) prevents management interference with the selection of a representative. Section 8(a)(2) prevents the employer from incapacitating the union by substituting its designee as the employee representative. Section 8(a)(3) does not purport to take away management's basic right to hire and fire, but its prohibition draws the line against employment of personnel policies with the purpose or effect of undermining the union.
 
 
 21
 Section 8(a)(5) is of the same fabric. A leading student of American labor policy points out that a key object of the requirement of collective bargaining is that management concede the existence of the employee labor organization. Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1407-09 (1958). As the Supreme Court said in NLRB v. Insurance Agents' International Union, 361 U.S. 477, 484-485, 80 S.Ct. 419, 424, 4 L.Ed.2d 454 (1960): 'That purpose (of 8(a)(5)) is the making effective of the duty of management to extend recognition to the union; the duty of management to bargain in good faith is essentially a corollary of its duty to recognize the union.'[7]
 
 
 22
 This basic policy suffuses a variety of 8(a)(5) cases. The employer is prohibited from making unilateral changes in working conditions during negotiations-- even though the terms of employment are thereby improved-- lest the union be denigrated in the employees' eyes and its existence, as an inevitable result, imperiled. NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949); NLRB v. Insurance Agents' International Union, supra, 361 U.S. at 485, 80 S.Ct. 419 (dictum). Similarly, issues have been deemed unbargainable (and thus, cannot be insisted upon to the point of impasse) where the effect of incorporating their terms in the agreement would be to deprive the union of its independence and vitality. NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349-350, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).
 
 
 23
 Distinguishable in details of legal context but highly material in central thrust are the many cases that have established the doctrine that an employer cannot delay or refuse to engage in bargaining in order to gain time wherein the union's weak majority may deteriorate, if his action is not in fact motivated by good faith doubts based on reasonable grounds.[8]
 
 
 24
 The requirement of 'good faith,' involving as it may an analysis of the motives of the parties, is a standard often difficult to apply. In designating what motivations run afoul of that requirement, the Board is not authorized to usurp the functions of the union or the company and dictate the terms of labor contracts. Administrative agencies will be required to follow Congressional mandate, whether explicit or ascertainable as inherent in underlying policy. In this case, however, the Board has not strayed from but has rather stayed within the course charted in the statutory provisions. Entering or conducting negotiations with the intent to destroy the other party would appear to be the archetypal example of a violation of the requirement that the parties must act in good faith. This basic conception, which has been applied by the Board and the courts in negativing good faith on the part of the union,[9] is fully applicable in negativing good faith on the part of the employer.[10]
 
 
 25
 The employer cannot claim that he satisfied the statutory obligation by solemnly attending bargaining sessions where checkoff was nominally on the agenda, then reciting that checkoff was being rejected as a matter of principle. The Act not only requires that the parties go through the motions of negotiation, but it also demands that they negotiate in good faith. Here there was a finding that the complete rejection of the Union's request for a checkoff or other dues collection assistance was not a bargaining in good faith. The Board's crucial finding negativing good faith was amply supported by the evidence: the 1964 campaign literature wherein the company itself identified refusal of checkoff with undermining this union's position; the 1961 action wherein the Company granted the checkoff to the more favored local union; the lack of reliance on inconvenience or other business purpose;[11] and the blanket refusal to consider alternatives-- all in a context of vigorous anti-union animus.
 
 
 26
 The Company put forward on argument the possibility that a company may hold back a checkoff for trading purposes. Assuming that the disclosure of such business purpose would have enabled the Company to avoid the condemnation of bad faith, the simple fact is that in the case before us no such point was put forward to the Union in the bargaining sessions. Instead the Company hardened on an alleged point of principle-- a claim at odds with both its conduct, including the checkoff granted in 1961 to another union, and its concession that checkoff is a mandatory subject of bargaining. An employer disingenuous in its bargaining sessions must take the risk of being taken at face value and being held to have violated its duty, for good-faith bargaining requires 'honest claims.' NLRB v. Truitt Mfg. Co., supra, 351 U.S. at 152, 76 S.Ct. 753.
 
 
 27
 It was the responsibility of the Trial Examiner and the Board to glean the state of mind of the agents of the Company from an examination of all the surrounding circumstances.[12] Congress has declined to restrict this function of the Board.[13] The Board's finding negativing good faith is supported by substantial evidence in the record taken as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 492-497, 71 S.Ct. 456, 95 L.Ed. 456 (1951). With that finding there is no barrier in law to the determination that the Company has violated 8(a)(5).
 
 
 28
 III. Remedy.
 
 
 29
 The Union urges that any relief short of requiring the Company to accept a voluntary checkoff is inadequate since it will not promote the policies of the Act. We must reject this contention in view of the discretion that Congress has conferred on the Board, with its training and experience, to accomplish the policies of the Act. Fibreboard Paper Products Corp, v. NLRB, supra, 379 U.S. at 216, 85 S.Ct. 398; Oil, Chemical & Atomic Workers Intern. Union, Local, 4-243 (Allied Chemical) v. NLRB, 124 U.S.App.D.C. 113, 115-116, 362 F.2d 943, 945-946 (1966).
 
 
 30
 The Union complains that this resolution means it has a right but no meaningful remedy. The court's judgment affirms the Board's order to the Company to bargain in good faith. Should the Company continue to refuse to bargain about a dues collection provision in good faith the Board may apply to the court to take further action, and even invoke the power to punish for contempt. We cannot assume that an employer, aware of the burden that attaches to a party that has already shown bad faith, will fail in the future to bargain in accordance with its obligations. Whether more effective relief is appropriate or necessary to effectuate the Act is a question primarily for the Board.[14] We cannot say it acted outside its proper range of discretion.
 
 
 31
 The petitions of the Company and the Union for review will be denied, and the Board's order will be enforced.
 
 
 32
 So ordered.
 
 BURGER, Circuit Judge (dissenting):
 
 33
 The Board here postulates the novel and internally inconsistent proposition that a bargainer can be found to have refused to bargain in good faith even while at the same time it is found to have engaged in bargaining in a good faith effort to reach an agreement and has actually reached a final and binding contract. The Board accomplishes this sleight-of-hand result by isolating one part of the whole spectrum of bargainable issues and saying, in effect, that on this particular issue, the employer must yield to the union unless he can give a satisfactory 'business reason' for refusing. The Board does not undertake to spell out how an employer could satisfy this unique standard. My use of the adjectives 'novel' and 'inconsistent' derives from 29 U.S.C. 158(d) (1964) which, while it commands that the parties bargain and 'confer in good faith,' adds the significant qualification that 'such obligation (to bargain) does not compel either party to agree to a proposal or require the making of a concession.'
 
 
 34
 Despite this latter provision, the Board of necessity has considered the reasonableness of parties' positions on particular issues to determine whether, under all the circumstances of the negotiation, a particular bargaining position was adopted for the purpose of frustrating negotiation generally and thus preventing an agreement.[1] But the courts have been vigilant lest the examination of parties' positions to test good faith become a process of judging, directly or indirectly, the substantive terms of their proposals.[2] Consequently, when the Board does inquire into the reasonableness of a position, its inquiry is not whether refusal of a certain demand is unreasonable but rather whether, in light of all the circumstances of the negotiation, there is evidence of a calculated effort to frustrate agreement generally; the issue is not whether the particular refusal is an unfair labor practice itself.[3]
 
 
 35
 The majority and the Board are unable to cite any case in which refusal to accept a single demand was held to be an unfair labor practice except where it was treated as evidence of general bad faith. The recent case of this Court relied on by the Board in its brief is such a case.[4] See United Steelworkers of America, (H. K. Porter Co.) v. NLRB, 124 U.S.App.D.C. 143, 363 F.2d 272, cert. denied, 385 U.S. 851, 87 S.Ct. 90, 17 L.Ed.2d 80 (1966). In the H. K. Porter case, there was a past history of findings of bad faith bargaining, and the trial examiner found that the refusal to agree to a checkoff was 'for the purpose of frustrating agreement with the Union,' i.e., frustrating any agreement. 124 U.S.App.D.C. at 144, 363 F.2d at 273. This crucial finding in the H. K. Porter case is missing here; in fact, the contrary was the conclusion of the trial examiner-- he found that the Company did intend to reach an agreement. The reliance in the H. K. Porter case on the lack of a valid reason for the refusal was directed toward the determination of whether the intransigence was designed to frustrate all negotiation. In the present case, the Board has converted some evidence of bad faith on a single issue into bad faith per se.
 
 
 36
 The trial examiner's opinion and the majority's both find comfort in the cases of NLRB v. Kentucky Utilities Co., 182 F.2d 810 (6th Cir. 1950), and Bausch & Lomb Optical Co., 108 N.L.R.B. 1555 (1954). But these cases do not deal with bad faith bargaining on one issue. They merely hold that an employer need not bargain with a union representative who seeks to destroy the employer or with a union which has become a business competitor of the employer. These situations were held to be defenses to charges of unfair labor practices against the employer who refused to bargain, rather than themselves supporting an unfair labor practice charge. Moreover, they dealt with general hostility, not with particular issues in what was otherwise good faith bargaining.
 
 
 37
 If I read the majority correctly, it decides that the conclusion of 'bad faith' on one subject alone is sufficient to support an unfair labor practice. This holding, the majority claims, 'follows' from NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). It is quite true that Katz found a failure to bargain in good faith even though there was no finding of over-all subjective bad faith. But that decision did not say that bad faith can now be found in the unreasonableness of one party's bargaining positions. In Katz, the question of good or bad faith in bargaining was never reached; there was instead a finding of a refusal to 'bargain.' Referring to the duty to bargain collectively as defined in 8(d), the Katz opinion stated: 'Clerly, the duty thus defined may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate in fact-- 'to meet * * * and confer'-- about any of the mandatory subjects.' Id. at 743, 82 S.Ct. at 1111. In Katz, the employer made changes in wages, sick-leave benefits and merit increases while these matters were under discussion with the union; these were obviously unfair tactics. The Court saidUnilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, add must of necessity obstruct bargaining, contrary to the congressional policy.
 
 
 38
 Id. at 747, 82 S.Ct. at 1114. This language makes it quite clear that Katz rests on a 'refusal to negotiate' on the terms in question. This clear violation of the duty to bargain in good faith is a far cry from a violation based upon a subjective analysis of the motives behind a bargaining position on a single issue of a party who does in fact negotiate and make a contract. Consequently, it is simply not correct to say that it 'follows' from Katz that a refusal to agree to one bargaining demand even if for an impermissible reason is by itself a failure to bargain in good faith.
 
 
 39
 It may be tempting to suggest that a corollary of the duty to bargain to reach an overall agreement is a duty to bargain with the object of reaching an agreement on each item proposed. But this has never been held to be the law by any court and it is inconsistent with the 8(d) provision that neither party need yield on a point. Merely because the employer proposes a management prerogative clause does not mean that the union bargains in bad faith if it fails to seek agreement on some form of management prerogative clause.[5] Would a union be guilty of bad faith bargaining if it adamantly refused to accede to a clause identifying precisely whom the union should include in its negotiating committee? Surely a union could refuse-- adamantly and rigidly-- to agree to any such clause, standing on the 'principle' that selection of its negotiators is for the union exclusively. Why should the same reasoning not apply to the Company's refusal?
 
 
 40
 Of course, no one would presume to argue that a mere failure to agree to the dues checkoff would be an unfair labor practice. Instead, this case turns on the unique proposition that the negotiator's motive for the failure to agree to a checkoff can support a finding of bad faith bargaining. This does not seem compatible with the Board's finding that there was a good faith effort to reach an agreement generally. The trial examiner's determination of bad faith was premised on his finding that the Company's bargaining was 'grounded in the Company's belief that if it refused the checkoff the Union would suffer and would porbably leave the scene.' The proposition of law that the Company is said to have violated was stated by the trial examiner as follows:
 
 
 41
 To bargain in good faith, the bargainer must advance his contentions and reject the other party's contentions (when he does) for legitimate reasons of self-interest, and out of what appear to him to be sound considerations of business (or union) judgment.[6]
 
 
 42
 No authority is cited for the proposition that failure to give 'business' reasons for rejection of a demand is itself an unfair labor practice. Would there not be 'legitimate reason of self-interest' in withholding approval of dues checkoff until some year's bargaining when the Company had little else to offer?
 
 
 43
 The majority rather startlingly dismisses the possibility that the refusal was a bargaining tactic[7] because 'in the case before us no such point was put forward to the Union in the bargaining sessions.' Presumably this means that the Company should have told the Union it was merely refusing to grant a check-off as a bargaining tactic. It should be apparent what the next step from this position is. The employer refusing to agree to a term and stating that it is doing so as a bargaining ploy will find the 'cost' in terms of the counter-concessions that it demands weighed to determine whether it is a good faith bargaining position. Otherwise, it would be simple for an employer to set a prohibitive cost to a union as the concession for which it is withholding agreement on a union demand. Once the rule is propounded, it cannot be permitted to be circumvented so simply. Thus, once such rule is made, it is quite clear that the Board and the courts are immersed in the substantive terms of the collective bargaining contract. This is not their role and the Supreme Court has been quite clear on this point.[8]
 
 
 44
 Furthermore, to admit that bargaining tactics are legitimate reasons to refuse to yield on a point and then to say that this reason can only be relied upon when it is revealed to the other party is to ignore the realities of the bargaining table. As the findings of this case indicate, bargaining motives are seldom singular, rarely articulated fully and frankly and often not susceptible to a clear and logical exposition. Most positions are at least partly taken for 'trading purposes.' The willingness to trade will quite naturally depend upon the importance of a particular issue to a bargainer. Particularly where there is some coolness in the bargaining,[9] it is unrealistic to expect bargainers to announce their positions and then declare that they are not firm positions, but are taken only in order to be traded away. This is especially unrealistic where the party intends to reserve a particular concession for another contract negotiation when he has greater need to use this valuable concession. Collective bargaining, after all, is a recurring process and each contract negotiation is influenced by those that went before and indeed by those to come.
 
 
 45
 Although apparently no case has held explicitly that a bargainer may legally refuse a demand without giving some 'business' reason, there is authority implying that he may lawfully do so. In NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), the employer conditioned acceptance of a contract on a 'ballot' clause calling for a pre-strike secret vote of the employees (union and non-union) and a 'recognition' clause which named the Local a party to the contract but excluded the International, which also had been certified by the Board. An employer might be hard pressed to articulate a 'business' reason for this, yet the case turned on whether these issues were mandatory subjects under 8(d) so that insistence to the point of impasse would be permissible and the Supreme Court held that they were not. There was no indication that if these issues were mandatory the employer could not have bargained to impasse because of the absence of a permissible business reason.
 
 
 46
 It is clearly on the premise that the motive for a bargaining stance on each issue must be a sound business-- or union-- reason that the present decision rests.[10] But the Supreme Court has said to the contrary. In NLRB v. Insurance Agents' International Union, 361 U.S. 477, 488, 80 S.Ct. 419, 426, 4 L.Ed.2d 454 (1960), the Court said that
 
 
 47
 It is apparent from the legislative history of the whole Act that the policy of Congress is to impose a mutual duty upon the parties to confer in good faith with a desire to reach agreement * * *. But apart from this essential standard of conduct, Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences.
 
 
 48
 In explaining why economic weapons to support a bargaining position are perfectly permissible, despite the Act's command to bargain in good faith, the Supreme Court has stated that:
 
 
 49
 It must be realized that collective bargaining, under a system where the Government does not attempt to control the results of negotiations, cannot be equated with an academic collective search for truth-- or even with what might be thought to be the ideal of one. The parties-- even granting the modification of views that may come from a realization of economic interdependence-- still proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest. The system has not reached the ideal of the philosophic notion that perfect understanding among people would lead to perfect agreement among them on values. The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized.
 
 
 50
 Id. at 488-489, 80 S.Ct. at 426.
 
 
 51
 This permissible use of economic weapons to support a bargaining position confirms the accepted reality that collective bargaining is more a practical-- even brutal-- economic confrontation than a statesmanlike minuet. Not only is the union permitted to strike to put economic pressure on the employer to accede to its demands, e.g., NLRB v. Insurance Agents' International Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), but also there is the recognition that the employer is entitled to use the lockout, although not as freely as a union may strike, as an economic weapon.
 
 
 52
 See American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); NLRB v. Brown Food Store, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).
 
 
 53
 Of course, the claim here is that the refusal was designed to 'harm' the union.[11] An employer with all his employees on strike is 'harmed' much more severely than a union without a dues checkoff. The 'harm' element clearly cannot stand alone, unless it is clear that the refusal is somehow different from permissible economic pressure placed on the union in the course of bargaining. Certainly, an employer cannot deliberately inflict economic pressure to weaken a union during bargaining. My point is simply that because the absence of a checkoff will cause extra expense and work for the Union and because the Company is aware of this fact does not distinguish this case from the normal economic pressures of the collective bargaining situation.
 
 
 54
 The majority opinion encourages a new bargaining device that can only serve to infringe on the whole collective bargaining process. The parties may now reach an over-all contract incorporating those provisions they agree on and excluding those they do not, after the usual 'horse trading' processes of bargaining, then one party can come to the Board and claim that the refusal to agree to some provision which was not included was an unfair labor practice because the recalicitrant party lacked a sufficient business or union reason. In the present case, the Union accepted the terms of the contract that emerged from the bargaining and signed a formal contract. In the give and take of collective bargaining, the inclusion of a checkoff provision may well have meant a different treatment of some other clauses-- wages for example. The Board and unions generally may well come to regret the day when component parts of bargained issues are considered in isolation.
 
 
 55
 I suggest that today's holding contains the seeds of danger for unions in their collective bargaining rights. The standards for bargaining in good faith are of necessity a two-way street; what the majority decides today applies to unions as well as to employers. Freedom of contract is highly important and to no one more than to the worker whose economic position is inherently weaker than that of the employer. A holding that the duty to bargain means one bargainer is compelled to agree, apart from being a contradiction in terms, is pregnant with the risk of a finding one day that a union must yield to some particular employer proposal unless it can articulate a solid union reason for not doing so. I would reject the notion that a union, in this context, must explain its motives to anyone.
 
 
 
 [1]
 29 U.S.C. 158 (1964)
 
 
 [2]
 Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 209-210, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); NLRB v. Katz, 369 U.S. 736, 742-743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962)
 
 
 [3]
 NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 136 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). It is commonplace that voluntary checkoff is the subject of collective bargaining. United Steelworkers of America (H.K.Porter Co.) v. NLRB, 124 U.S.App.D.C. 143, 363 F.2d 272, 274, n. 6, cert. denied 385 U.S. 851, 87 S.Ct. 90, 17 L.Ed.2d 80 (1966). Industrial practice is appropriately considered in ascertaining the scope of mandatory bargaining. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 211, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); NLRB v. American Nat. Ins. Co., 343 U.S. 395, 408, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). Cf. Brotherhood of Ry. Trainmen v. Akron & Barberton Belt R.R. Co., 128 U.S.App.D.C. 59, 385 F.2d 581 (May 12, 1967)
 
 
 [4]
 See United Steelworkers of America, AFL-CIO (H.K.Porter Co.) v. NLRB, 124 U.S.App.D.C. 143, 363 F.2d 272, cert. denied. 385 U.S. 851, 87 S.Ct. 90, 17 L.Ed.2d 80 (1966)
 
 
 [5]
 E.g., NLRB v. Truitt Mfg. Co., 351 U.S. 149, 153, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); NLRB v. American Nat. Ins. Co., 343 U.S. 395, 410, 72 S.Ct. 824, 96 L.Ed. 1027 (1952)
 
 
 [6]
 'It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing * * *.' National Labor Relations Act, 49 Stat. 449 (1935), as amended, 61 Stat. 136 (1947), 29 U.S.C. 151 (1964)
 
 
 [7]
 See remarks of Senator Wagner on S. 1958, 79 CONG.REC. 7571 (1935): 'But the right of workers to bargain collectively through representatives of their own choosing must be matched by the correlative duty of employers to recognize and deal in good faith with these representatives. The Government itself is held up to ridicule when the elections which it supervises are rendered illusory by failure to acknowledge their results. And needless to say, such a contradicotory course generates perpetual discontent and strife.'
 
 
 [8]
 Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 369, 185 F.2d 732, 741 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951); Amalgamated Clothing Workers (Sagamore Shirt Co.) v. NLRB, 124 U.S.App.D.C. 365, 376, 365 F.2d 898, 909 (1966); Skyline Homes, Inc. v. NLRB, 323 F.2d 642, 648 (5th Cir. 1963), cert. denied, 376 U.S. 909, 84 S.Ct. 662, 11 L.Ed.2d 607 (1964); NLRB v. Charles R. Krimm Lumber Co., 203 F.2d 194, 196 (2d Cir. 1953); Colson Corp. v. NLRB, 347 F.2d 128, 138 (8th Cir.), cert. denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965). The employer violates the act even where he has good faith doubts as to the appropriate unit, and hence the union's majority status, where these doubts are not 'the key motivating factor in (his) refusal to bargain,' for example, where he delays resolution of his doubts, if any, to help assure that, no matter what unit is ultimately deemed appropriate, the union will not have a majority. NLRB v. Luisi Truck Lines, 384 F.2d 842 (9th Cir., Oct. 27, 1967); Louisville Typographical Union No. 10 v. NLRB, No. 20691 (D.C. Cir. December 26, 1967); cf. NLRB v. Austin Powder Co., 350 F.2d 973, 977 (6th Cir. 1965)
 
 
 [9]
 See NLRB v. Kentucky Utilities Co., 182 F.2d 810 (6th Cir. 1950); Bausch & Lomb Optical Co., 108 N.L.R.B. 1555 (1954)
 
 
 [10]
 In NLRB v. J. A. Terteling & Sons, Inc., 357 F.2d 661 (9th Cir. 1966) (per curiam), the court, quoting the Board, found a breach of the duty to bargain in good faith where 'Respondent (Company) approached the bargaining table not with the sincere purpose of bargaining in good faith but to prolong negotiations and undermine the Union's status as majority representative, and thus to evade its statutory bargaining obligation.' 357 F.2d at 661-662
 
 
 [11]
 The Union agreed to sustain any expense incident to a checkoff. Several of the rejected alternatives did not require the management to take any action
 The fact that the Board considered the absence of business purpose as an evidentiary indication negativing good faith in the circumstances of this case is not to be taken as a ruling that business purposes are the only watchword for good faith.
 
 
 [12]
 NLRB v. Truitt Mfg. Co., 351 U.S. 149, 154-155, 76 S.Ct. 753, 100 L.Ed. 1027 (1956) (Frankfurter, J., concurring in part and dissenting in part); Retail Clerks Union, No. 1550 v. NLRB, 117 U.S.A.pp.D.C. 336, 342 n. 5, 330 F.2d 210, 216, cert. denied, 379 U.S. 828, 85 S.Ct. 59, 13 L.Ed.2d 39 (1964); Local 833, UAW-AFL-CIO, International Union, United Automobile, Aircraft & Agricultural etc. v. NLRB, 112 U.S.A.pp.D.C. 107, 114, 300 F.2d 699, 706, cert, denied sub nom Kohler Co. v. Local 833, UAW-AFL-CIO, International Union, United Automobile, Aircraft & Agricultural etc., 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962); Joy Silk Mills, Inc. v. NLRB, supra, 87 U.S.A.pp.D.C. at 370, 185 F.2d at 742; NLRB v. National Shoes, Inc., 208 F.2d 688, 691 (2d Cir. 1953); Solo Cup Co. v. NLRB, 332 F.2d 447, 448 (4th Cir. 1964)
 
 
 [13]
 In 1947, certain members of Congress were dissatisfied with leaving to the Board a relatively free hand in determining from the facts whether the employer had met the subjective requirement of good faith bargaining. In response, an effort was made to define narrowly what constituted 'collective bargaining.' H.R. 3020, 80th Cong., 1st Sess. 11. This restrictive measure was rejected by the House and Senate Conferees in favor of the present 8(d). See H.R. CONF. REP. No. 510, 80th Cong., 1st Sess. 34-35 (1947), U.S.Code Congressional Service, p. 1135
 
 
 [14]
 See United Steelworkers of America, AFL-CIO (H. K. Porter Co.) v. NLRB, U.S.App.D.C. , 389 F.2d 295 (December 8, 1967) (on motion for reconsideration of denial of motion to clarify decree)
 
 
 [1]
 E.g., NLRB v. Herman Sausage Co., 275 F.2d 229 (5th Cir. 1960); Majure v. NLRB, 198 F.2d 735 (5th Cir. 1952)
 
 
 [2]
 E.g., NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); NLRB v. Almeida Bus Lines, Inc., 333 F.2d 729 (1st Cir. 1964); NLRB v. Lewin-Mathes Co., 285 F.2d 329 (7th Cir. 1960); White v. NLRB, 255 F.2d 564 (5th Cir. 1958)
 
 
 [3]
 While the Board cannot force an employer to make a 'concession' on any specific issue or to adopt any particular position, the employer is obliged to make some reasonable effort in some direction to compose his differences with the union. * * *
 NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 134-135 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953).
 
 
 [4]
 NLRB v. J. A. Terteling & Sons, Inc., 357 F.2d 661 (9th Cir. 1966), cited by the majority, is another case of general bad faith, where the employer was found to have negotiated 'with no intention ever to reach an agreement.' Ibid
 
 
 [5]
 In NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), the union flatly refused to agree to such a clause and there was no suggestion that it was improper to do so
 
 
 [6]
 It is perfectly clear from the following quote from the trial examiner's opinion that this rule requires an examination of the motives of the bargainers:
 Where an employer takes a position in bargaining, not to advance his own economic interest, or to safeguard the rights or interests of his employees, but for the purpose of damaging or destroying the union with which he is bargaining, then he is not bargaining in good faith. This is not to say that the employer must grant a union's demands which do not appear harmful to the employer, but only to say that the employer's motives and objectives must be legitimate, and the 'principle' on which he stands must be permissible under the statute (e.g., an unwillingness to prefer the union over other creditors of his employees) not, as here, the impermissible object of harm to the other party.
 
 
 [7]
 The majority appears to concede that holding back on an issue for 'trading purposes' is a legitimate business reason. See p. 852 supra
 
 
 [8]
 The Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements
 NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952).
 
 
 [9]
 Referring to the attitudes of those in the bargaining situation, in another case where the employer refused to grant the union a checkoff, the First Circuit observed:
 We recognize the existence of a cool atmosphere between respondent and its opposite number across the bargaining table. The company did not want this union and over a period of years had been successful in keeping it out. It could not be expected that after the Union had finally won the battle it would be welcomed in with open arms. On its part, the Union, quite naturally, was determined to bring respondent into line with the other bus companies with which it had collective bargaining agreements.
 NLRB v. Almeida Bus Lines, Inc., 333 F.2d 729, 731-732 (1st Cir. 1964).
 
 
 [10]
 The majority finds 'bad faith' in that 'the Company's bargaining stance was adopted in order that the Union's status as bargaining representative, which it had unsuccessfully resisted in the election campaign, might be weakened and destroyed.' Supra p. 849
 
 
 [11]
 The majority opinion (see note 8 and related text) seems to rest its case in part on holdings in situations where an employer used dilatory tactics in bargaining in order to weaken the union. No such factors are present here. The parties bargained, they agreed, they made a contract; the union then resuscitated one of its demands, in isolation, by way of an unfair practice claim