363 F.2d 272
 UNITED STEELWORKERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
H. K. PORTER COMPANY, INC., DISSTON DIVISION-DANVILLE WORKS, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 19492.
 No. 19507.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 22, 1966.
 Decided May 19, 1966.
 Certiorari Denied October 10, 1966.
 
 See 87 S.Ct. 90.
 Mr. Michael H. Gottesman, Washington, D. C., with whom Mr. Elliot Bredhoff, Washington, D. C., was on the brief, for petitioner in No. 19,492.
 Mr. Donald C. Winson, Pittsburgh, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Messrs. Bartholomew A. Diggins, Daniel W. Sixbey, Washington, D. C., and Paul R. Obert, Pittsburgh, Pa., were on the brief, for petitioner in No. 19,507.
 Mr. Elliott Moore, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Morton Namrow, Attorney, National Labor Relations Board, were on the brief, for respondent.
 Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT, Circuit Judge.
 J. SKELLY WRIGHT, Circuit Judge.
 
 
 1
 These cases are before the court on petitions filed by both the union and the employer to review a final order of the National Labor Relations Board. The Board has filed a cross-petition to enforce its order requiring the company to bargain in good faith.
 
 
 2
 Pursuant to a secret ballot election, the union was certified on October 5, 1961, as the collective bargaining representative of all production employees at the employer's Danville, Virginia, plant. After four years of bargaining and two orders from the Board requiring the employer to cease and desist from refusing to bargain collectively with the union, the second of which included the provision that the employer also cease and desist from "interfering with, restraining or coercing employees in the exercise of their right to self-organization * * *," no agreement has been reached. It is the second order which is the subject of these proceedings, the first order having been summarily enforced on July 17, 1964, by the United States Court of Appeals for the Fourth Circuit after the company filed no exceptions to the trial examiner's findings or proposed order. See 61 STAT. 147 (1947), 29 U.S.C. § 160(c).
 
 
 3
 The narrow issue presented by the present proceeding, according to the trial examiner, is "whether, as the General Counsel contends, [the employer's] position on the Union's demands for a check off was a mere device to frustrate agreement on a contract, or whether, as [the employer] contends, it was merely engaging in `hard bargaining,' with no intention of preventing an agreement." The trial examiner concluded that the employer's refusal to grant a check-off was "for the purpose of frustrating agreement with the Union and hence [the employer had] engaged in bad-faith bargaining." The Board, through a three-member panel convened pursuant to Section 3[1] of the National Labor Relations Act, adopted the trial examiner's findings, conclusions, recommendations and proposed order.
 
 
 4
 The employer, citing Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), maintains that the trial examiner's finding that the company refused to agree to a dues check-off provision in order to frustrate an agreement is not supported by substantial evidence on the record considered as a whole. It argues that, while Section 8(d)[2] of the Act requires good faith bargaining, it does not compel either party to agree to a proposal or require the making of a concession. Our study of the record, however, convinces us that the Board's findings are supported by substantial evidence on the record considered as a whole, and that the company's adamant refusal to consider a union dues check-off for those employees who individually requested it did indeed frustrate the bargaining.
 
 
 5
 In the prior proceeding, in which the Board likewise found violations of Sections 8(a) (5)[3] and (1)[4] of the Act, in addition to making unilateral changes in working conditions which it had refused to grant the union, the company had also refused to agree to an arbitration provision while insisting on a nostrike clause. This insistence, the Board found, demonstrated bad faith bargaining on the part of the company contrary to the observation in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed. 2d 972 (1957), that "* * * the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike."
 
 
 6
 In spite of the Board's order in the prior proceeding, it was not until ten months and 20 bargaining sessions following its issuance that the company receded from the position which the Board had found to amount to an unfair labor practice. When bargaining was resumed after the Board's prior order, some 14 items were open and unresolved. At the time of the final meeting on September 10, 1964, only three items remained unresolved, the union having given in on all of the others.[5]
 
 
 7
 Throughout the negotiations, both before the prior order and subsequent to it, the union had insisted on a dues check-off. The union maintains no office in Danville, that area being serviced from Roanoke, Virginia, a distance of about 85 miles. Moreover, the 300 company employees live within a radius of from 35 to 40 miles from Danville. Thus without a check-off, or some adequate substitute therefor, the collection of dues would have presented the union with a substantial problem of communication and transportation.[6]
 
 
 8
 The company admitted that it had no general policy against a dues check-off; that indeed in some of its divisions the bargaining agreements so provide.[7] The company admitted, too, that the refusal to check off union dues at the Danville plant was not based on inconvenience.[8] As a matter of fact, the Danville plant was checking off from the salaries of its employees for purchase of United States savings bonds, dependents' coverage under health insurance, United Fund, and a Good Neighbor Fund.[9] The company's position, as stated by its counsel and by its chief negotiator, was simply that "our purpose in denying check-off was that we were not going to aid and comfort the union."[10]
 
 
 9
 It is clear from the record in this case that the prior order of the Board, drawn, as is the order in suit here, in terms of the statute,[11] requiring the company to bargain in good faith, was ineffective. Instead of starting a new Section 10(b)[12] proceeding, the Board no doubt could have requested the Fourth Circuit to cite the company for contempt for continuing failure to bargain in good faith. Certainly a succession of Section 10(b) proceedings resulting in Board orders cast in statutory language is not the answer where refusal to bargain persists. In order to eliminate further frustration of the purposes of the Act,[13] the union suggests that the Board should have included in its order a provision requiring the company to withdraw its objection to the dues check-off. Moreover, the union suggests that, since the company not only refused the check-off but also refused to allow the union to collect dues during non-working hours on non-working areas of the company premises,[14] a further provision should be included in the Board's order protecting this statutory right as well.
 
 
 10
 It is true, as the company contends, that under Section 8(d)[15] it cannot be compelled to agree to a proposal or make a concession. But neither can refusal to make concessions be used "as a cloak * * * to conceal a purposeful strategy to make bargaining futile * *." N. L. R. B. v. Herman Sausage Co., 5 Cir., 275 F.2d 229, 232 (1960). "Collective bargaining, then, is not simply an occasion for purely formal meetings between management and labor, while each maintains an attitude of `take it or leave it'; it presupposes a desire to reach ultimate agreement, to enter into a collective bargaining contract." N. L. R. B. v. Insurance Agents' Intern. Union, 361 U.S. 477, 485, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960).
 
 
 11
 While it is clear from the record that the company had no reason, other than to frustrate the bargaining procedure, to refuse to accept the dues check-off,[16] it is not necessary to include a specific reference to the check-off in the Board's order.[17] Nor, in the circumstances of this case, is it necessary to provide in the order that the union shall have the right to collect dues during non-working hours on non-working areas of the company's premises.[18] In any contempt proceeding, the record made before the Board in both Section 10(b) proceedings will be available to this court. Thus we will be in a position to make a judgment based not only on the Board's order, but on the entire record of this company's performance at the bargaining table.
 
 
 12
 Affirmed and enforced.
 
 
 
 Notes:
 
 
 [1]
 73 STAT. 542 (1959), 29 U.S.C. § 153(b)
 
 
 [2]
 61 STAT. 142 (1947), 29 U.S.C. § 158(d)
 
 
 [3]
 61 STAT. 141 (1947), 29 U.S.C. § 158(a) (5)
 
 
 [4]
 61 STAT. 140 (1947), 29 U.S.C. § 158(a) (1). Sections 8(a) (1) and (5) of the Act read:
 "(a) It shall be an unfair labor practice for an employer —
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
 * * * * * * *
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)."
 
 
 [5]
 The representative of the union testified, without contradiction, as follows:
 Q. When parties began meeting in October of 1963, how many items were there that the union was demanding; before they would agree to a contract?
 A. Fourteen.
 Q. Your testimony is that they are now demanding three?
 A. Well, actually, it covers a number of things.
 Q. What's happening to those issues that you didn't refer to in your testimony earlier?
 A. In the hopes of getting an agreement, the union gradually held twenty meetings, and dropped all those demands except those I mentioned.
 The examiner reported that subsequent to the Board's prior order "each of the parties withdrew certain of its bargaining proposals." With reference to the company's concessions, the examiner is apparently referring to the withdrawal of the company's no-strike clause demand without arbitration, which withdrawal was required by the Board's prior order.
 
 
 [6]
 The check-off is included in 92 per cent of all contracts in manufacturing industries. See BNA, COLLECTIVE BARGAINING NEGOTIATIONS AND CONTRACTS, p. 87:3. Most of the contracts not containing check-off provide some alternative method of dues collection on company propertyId. at p. 87:901.
 
 
 [7]
 
 Q. Is there a company policy, that is a policy of H. K. Porter Company, against the check-off of union dues?
 A. [By Witness T. C. Jones, chief negotiator for the company] We do have some contracts at some of our plants that do have check-off, I do know that.
 Q. Is there, to your knowledge, a company policy against the check-off?
 A. Being a company policy, not that I know of.
 Q. Is there a company policy against the collection of union dues on company property?
 A. Not any that I am aware of.
 Q. So your position on these matters is not dictated by company policy?
 A. That is correct.
 
 
 [8]
 
 Q. You have never taken the position, have you, that there was any inconvenience to the company in checking off union dues?
 A. [By Witness Jones, chief negotiator] To the best of my knowledge, no, sir, we have not.
 Q. In point of fact, there would be no more inconvenience, would it, than checking off Savings Bonds or insurance coverage or United Fund contributions, or any other item?
 A. That's right.
 Q. As I understand your testimony, I want to get this clear, your sole reason for rejecting the demand for a check-off or for dues collection in the plant was that this was union business?
 A. Right; this was union business, and the union should collect their own business; yes, sir. And I should have nothing to do with it.
 
 
 [9]
 
 Q. I'll be right direct with you, Mr. Jones [chief negotiator], does your company, or has your company in the past made any deductions from payroll, other than those required by law?
 A. Yes, sir.
 Q. Would you name what the purpose was for which those deductions were made?
 A. We deduct Treasury Bonds.
 Q. United States Savings Bonds?
 A. The United States Savings Bonds. We deduct dependents coverage on the insurance policy; we deduct —
 TRIAL EXAMINER: That's health insurance?
 THE WITNESS: Yes, sir. And we deduct a United Fund and Good Neighbor Fund.
 
 
 [10]
 
 Q. [By counsel for the company] As I understand your testimony, the reason for refusing to grant check-off or collection of union dues, was that you were not going to aid and comfort the union, in the union business?
 A. [By Witness Jones, chief negotiator] Yes, sir, that's right.
 
 
 [11]
 Section 8(a) (5), 29 U.S.C. § 158(a) (5)
 
 
 [12]
 61 STAT. 146 (1947), 29 U.S.C. § 160 (b)
 
 
 [13]
 61 STAT. 143 (1947), 29 U.S.C. § 159. See also 61 STAT. 141 (1947), 29 U.S.C. § 141
 
 
 [14]
 
 Q. Mr. Jones [chief negotiator], you were in the room when Mr. Bloodworth testified, were you not?
 A. Yes, sir.
 Q. His testimony was that the subject was discussed, the subject of check-off was discussed at almost all of your meetings; and the company's consistent position has been that you will not check off union dues, is that correct?
 A. That's correct.
 Q. He also testified that the union offered to withdraw his request for check-off, if the company were willing to agree to some kind of an arrangement, whereby the union could collect its dues in the plant, from employees during periods when they were not working?
 A. That is correct.
 Q. They made that offer?
 A. Yes, sir.
 Q. What was your position on that?
 A. My position is and was then that that's union business.
 Q. And therefore —
 A. They could collect their own dues at their own meetings or at their offices.
 Q. Your position that you would not permit this on the plant grounds?
 A. Yes, sir.
 * * * * *
 TRIAL EXAMINER: What is your objection to a union official collecting it from employees at the lunch hour, or when coming to or leaving work?
 THE WITNESS: I just think that I should not help the union collect their dues, and this is what I am doing, when I let them collect it on company property, when they can go right to their union meetings that they hold here and collect the dues at the regular meetings they have in town.
 
 
 [15]
 Section 8(d), 29 U.S.C. § 158(d), reads in part:
 "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *."
 
 
 [16]
 Footnote 9 in the trial examiner's findings reads in part:
 "This is not to say that in the resumed bargaining sessions which I shall recommend, Respondent will be required to agree to some form of check off. I only find and conclude that on that issue Respondent did not heretofore bargain in good faith, and that it should be required to do so. If after such good-faith bargaining the parties reach an agreement or an impasse, the requirements of the Act will have been fulfilled. * * *"
 This footnote is inconsistent with the trial examiner's finding that the company's refusal to grant a check-off was "for the purpose of frustrating agreement with the Union and hence [the company had] engaged in bad-faith bargaining." To suggest that in further bargaining the company may refuse a check-off for some other reason, not heretofore advanced, makes a mockery of the collective bargaining required by the statute. Since the text of the trial examiner's decision controls, Footnote 9 should be disregarded.
 
 
 [17]
 Compare J. I. Case Co. v. N. L. R. B., 321 U.S. 332, 341, 64 S.Ct. 576, 88 L.Ed. 762 (1944); Burr v. N. L. R. B., 5 Cir., 321 F.2d 612, 615 (1963)
 
 
 [18]
 It would serve no useful purpose to have another § 10(b) proceeding to require the company to allow the union to collect dues during non-working hours on non-working areas of the company's premises. The issue was raised in these proceedings and the company offered no good reasons for its flat refusal to allow the dues collection on its premises. Compare Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); N. L. R. B. v. Walton Manufacturing Company, 5 Cir., 289 F.2d 177 (1961)
 
 
 
 13
 WILBUR K. MILLER, Senior Circuit Judge, dissenting in No. 19,507:
 
 
 14
 It is my view that the Labor Board's decision, here under review, is not supported by substantial evidence when the record is considered as a whole in the manner described and prescribed by Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Consequently, I cannot agree with my brothers of the majority when they say in their opinion:
 
 
 15
 "* * * Our study of the record, however, convinces us that the Board's findings are supported by substantial evidence on the record considered as a whole, and that the company's adamant refusal to consider a union dues check-off for those employees who individually requested it did indeed frustrate the bargaining."
 
 
 16
 The union was just as adamant in refusing to sign a contract which did not contain a checkoff clause or some other means of company aid in collecting union dues. Its representative informed the Company's negotiator of this firm purpose, and counsel for the Board's General Counsel (the charging party) told the examiner that his inquiry showed the union would not sign a contract without a checkoff. Thus, the union never intended to bargain on that issue; it simply stated it must have a dues collection provision or there would be no contract. In these circumstances, it is difficult for me to understand how it can be said that the Porter Company's position on the checkoff issue "did indeed frustrate the bargaining." Because of the union's attitude on the issue — its stated determination not to negotiate in good faith with respect to it — bargaining as to a checkoff provision was impossible from the beginning. Yet it is the Company, not the union, which has been found guilty of an unfair labor practice.
 
 
 17
 The examiner's decision, adopted by the Board, dwelt on the union's need for a checkoff which could be granted by the Company without inconvenience to itself. And the majority opinion notes the union's consistent insistence on a dues checkoff and attempts to justify it by saying:
 
 
 18
 "* * * The union maintains no office in Danville, that area being serviced from Roanoke, Virginia, a distance of about 85 miles. Moreover, the 300 company employees live within a radius of from 35 to 40 miles from Danville. Thus without a check-off, or some adequate substitute therefor, the collection of dues would have presented the union with a substantial problem of communication and transportation."
 
 
 19
 But the record shows the union has a mailing address at the home of a member in Danville. Members could mail their dues to that address or to the office in Roanoke, or dues could be collected at the monthly union meetings. Moreover, it was shown that the union has a potential income of $1,500 per month from the Danville members, which would seem to justify the establishment of a small office in that town where dues could be paid. Thus there was no real necessity for the union's unalterable insistence on a check-off clause.
 
 
 20
 Nevertheless, the examiner said in his decision:[1]
 
 
 21
 "* * * I find and conclude that with respect to the issue of checkoff, Respondent [the Company] bargained with the Union from October 23, 1963, through September 10, 1964, in bad faith and thereby violated Section 8(a) (5) and (1) of the Act."
 
 He also stated:
 
 22
 "* * * My careful consideration of the entire record convinces me that Plant Manager Jones, Respondent's chief negotiator, took the position he did with respect to the checkoff issue, for the purpose of frustrating agreement with the Union, and hence engaged in bad-faith bargaining. * * *"
 
 
 23
 He said he based the foregoing conclusion upon three "factors," which I here reproduce, largely in his own words:
 
 
 24
 1. That the demeanor of T. C. Jones, the Company's negotiator, while testifying in the present proceeding, "convinced me that his attitude toward collective bargaining had not changed since he testified in the prior case."[2]
 
 
 25
 2. "Jones' explanation for [sic] his refusal to agree to any of the Union's suggestions for the collection of its dues, namely, that he did not wish to give aid and comfort to the Union by assisting it in collecting dues, if not actually a false reason, evidences an attitude inconsistent with the obligation imposed upon an employer by the Act." This reason for refusing to agree to a checkoff tended, the examiner said, to disparage or discredit the union in the eyes of the employees.
 
 
 26
 3. "In the instant case Respondent seeks to explain away the fact that at other plants it has contracts with unions which provide for a checkoff, by arguing, in substance, that those provisions were brought about by reason of the economic strength of the union there involved, and urges that the Union's remedy in this case was to call a strike rather than prosecute an unfair labor practice charge. Not only does such a position by an employer run counter to the objectives of the Act which Congress set forth in its statement of `Findings and Policies' (see Section 1 of the Act), but it also demonstrates that Respondent's purpose was to forestall reaching an agreement with the Union by the expedient of disparaging the latter in the eyes of the employees. Cf. Sunbeam Plastic Corporation, 144 NLRB 1010. This would seem to be particularly true in view of Respondent's admission that checking off union dues would impose no burden upon it, and its admitted checkoff for Government Bond and United Givers Fund, neither of which seem particularly necessary for the promotion of Respondent's business."
 
 
 27
 Thus it is apparent the examiner based his conclusion that the Company had bargained in bad faith upon three "factors," none of which rises to the level of proof: (a) that Jones's demeanor showed anti-union animus, and (b) that two of the positions taken by the Company during bargaining tended to disparage or discredit the union in the eyes of the employees. Nothing else in the record was pointed out by the examiner as supporting his conclusion, and I have discovered nothing which in the slightest degree supports it. His conclusion, then, stands or falls on the validity of the anti-union animus and union disparagement "factors" which he expressly set forth.
 
 
 28
 Antiunion animus on the part of an employer, even if shown by the record, is not an unfair labor practice. Metal Processors' Union, etc. v. N. L. R. B., 119 U.S.App.D.C. 78, 81, 337 F.2d 114, 117 (1964). For that reason, the first of the three "factors" upon which the examiner relied to support his conclusion of bad-faith bargaining falls of its own weight, even if the examiner's holding of Jones's alleged antiunion animus had been borne out by the record. But here the examiner did not purport to base his finding of antiunion animus on any evidence in the record, but merely on his own statement that "Jones' demeanor while testifying in the immediate proceeding convinced me that his attitude toward collective bargaining had not changed since he testified in the prior case."
 
 
 29
 The "prior case" to which the examiner referred arose from a complaint charging the Porter Company with bad-faith bargaining because, after 28 bargaining sessions between November 3, 1961, and November 27, 1962, the parties had not reached an agreement. The recommended order of the examiner in the prior case, issued with his decision on September 20, 1963, required the Company, upon request, to bargain with the union. Without waiting for the Board's decision,[3] the Company began almost immediately to bargain with the union as ordered by the examiner in the prior case. The parties met in 21 bargaining sessions, beginning October 23, 1963, and ending September 10, 1964. These meetings, the subject of the present proceeding, were fruitful. Of the 14 issues which were open and unresolved when the meetings began October 23, 1963, 11 were resolved by the process of bargaining, so that only three remained unresolved at the adjournment of the final session on September 10, 1964. These were wages, health and life insurance, and checkoff.
 
 
 30
 The examiner in the earlier case did not find that Jones had antiunion animus; the present examiner decided that for himself from a reading of the prior examiner's decision, and then concluded that Jones's demeanor in the present proceeding showed he still had that animus. The present examiner said in this connection:
 
 
 31
 "I fully recognize that because an employer engaged in bad-faith bargaining in one set of negotiations, it does not necessarily follow that the employer's subsequent bargaining negotiations were conducted in bad faith. I merely hold that an employer's bad-faith bargaining in the prior negotiations is a factor to be considered, along with the other circumstances of the case, in determining whether his subsequent bargaining was in good faith."
 
 
 32
 Although the examiner found that, with respect to the checkoff issue the Company bargained with the union in bad faith and ordered resumption of bargaining, he expressly disclaimed any intention to require the Company to agree to aid in the collection of dues. Footnote 9 to the examiner's decision contains the following:
 
 
 33
 "This is not to say that in the resumed bargaining sessions which I shall recommend, Respondent will be required to agree to some form of checkoff. I only find and conclude that on that issue Respondent did not heretofore bargain in good faith, and that it should be required to do so. If after such good-faith bargaining, the parties reach an agreement or an impasse, the requirements of the Act will have been fulfilled. * * *"
 
 
 34
 Thus the examiner gave lip service to Section 8(d) of the Act, 29 U.S.C. § 158(d), which is in part as follows:
 
 
 35
 "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." (Emphasis supplied.)
 
 
 36
 But his decision that, by not agreeing to a dues collection provision, which he thought the union badly needed and which would cause it no inconvenience, the Company had not bargained in good faith, left no room for doubt that what he termed good-faith bargaining would require the Company to yield on the checkoff issue. This is, of course, contrary to the express provision of the statute quoted above.
 
 
 37
 This leaves for consideration the other two "factors" upon which the examiner based his conclusion of bad-faith bargaining on the part of the Company. First, as he put it,
 
 
 38
 "Jones' explanation for his refusal to agree to any of the Union's suggestions for the collection of its dues, namely, that he did not wish to give aid and comfort to the Union by assisting it in collecting dues, if not actually a false reason, evidences an attitude inconsistent with the obligation imposed upon an employer by the Act. The very act of bargaining with a union, thus granting it recognition as the representative of the employees, in and of itself gives aid, comfort, assistance and prestige to that Union. But the policies of the Act, and the basic principles upon which it rests, require an employer to give this kind of `aid and comfort' to the designated representatives of its employees. For, as the Board had held in a somewhat comparable situation, it is inconsistent with the bargaining obligation which the Act imposes upon an employer for the latter to conduct negotiations with the statutory representative in such a manner as to disparage or discredit the statutory representative in the eyes of its employee constituents. General Electric Company, 150 NLRB No. 36."
 
 
 39
 The second "factor" was another statement of the Company, to which I have heretofore referred. The examiner said it showed the employer's purpose "was to forestall reaching an agreement with the Union by the expedient of disparaging the latter in the eyes of the employees."
 
 
 40
 The examiner was indeed hard put to it when he concocted these two "factors" as bases for his conclusion. He confused the union with its members and erroneously thought an employer is somehow required to avoid any act which may disparage or discredit a union in the eyes of the employees. The Act is for the benefit of employees and not unions and, as Mr. Justice Rutledge said, "Nothing in the Act requires an employer to maintain a union's prestige * * *."[4]
 
 
 41
 Additionally, I point out that the examiner did not expressly find that the Company said or did anything which actually disparaged or discredited the union; he merely said disparaging or discrediting a union is inconsistent with an employer's duty under the Act. As Mr. Justice Rutledge said, 326 U.S. at 399, 66 S.Ct. at 216, "Something more than supposition should underlie a conclusion which supports a finding of unfair practice."
 
 
 42
 The fact that the examiner's three "factors" fall so far short of supporting his conclusion of bad-faith bargaining on the part of the Company, and the further fact that the record considered as a whole is devoid of support for his conclusion, lead me to think the examiner was actuated by antimanagement animus. The three-member panel of the Board which rubber-stamped the examiner's decision either did so without examining the record or, I suggest, shared his antimanagement animus.
 
 
 43
 Before concluding, I call attention to the following statement in the majority opinion:
 
 
 44
 "* * * When bargaining was resumed after the Board's prior order, some 14 items were open and unresolved. At the time of the final meeting on September 10, 1964, only three items remained unresolved, the union having given in on all of the others." (Emphasis supplied.)
 
 
 45
 The italicized clause is erroneous. Even the examiner did not go so far; on this subject, his decision said:
 
 
 46
 "* * * During the negotiations which followed, each of the parties withdrew certain of its bargaining proposals, so that upon adjournment of the final meeting on September 10, only 3 items remained unresolved. These were wages, health and life insurance, and checkoff. * * *"
 
 
 47
 I have heretofore quoted a portion of the examiner's footnote 9 to show that even he realized he could not order the Company to agree to a checkoff because Section 8(d) of the Act provides that the mutual obligation of an employer and a union to confer in good faith
 
 
 48
 "* * * does not compel either party to agree to a proposal or require the making of a concession * * *."
 
 
 49
 With respect to this the majority opinion says in footnote 16:
 
 
 50
 "Footnote 9 in the trial examiner's findings reads in part:
 
 
 51
 "`This is not to say that in the resumed bargaining sessions which I shall recommend, Respondent will be required to agree to some form of check off. I only find and conclude that on that issue Respondent did not heretofore bargain in good faith, and that it should be required to do so. If after such good-faith bargaining the parties reach an agreement or an impasse, the requirements of the Act will have been fulfilled. * * *' This footnote is inconsistent with the trial examiner's finding that the company's refusal to grant a check-off was `for the purpose of frustrating agreement with the Union and hence [the company had] engaged in bad-faith bargaining.' To suggest that in further bargaining the company may refuse a check-off for some other reason, not heretofore advanced, makes a mockery of the collective bargaining required by the statute. Since the text of the trial examiner's decision controls, Footnote 9 should be disregarded."
 
 
 52
 Thus, in holding the examiner's footnote 9 should be disregarded, the majority hold in effect that Section 8(d) of the Act should be disregarded, and that the Company should be held in contempt if, on remand, it does not agree to a contractual provision for some sort of Company aid in the collection of union dues.
 
 
 53
 I have seldom seen a record so barren of support for the decision of the examiner and the Board, and I earnestly dissent from the majority opinion which upholds that decision.
 
 
 54
 I concur in the affirmance of No. 19,492.
 
 
 
 Notes:
 
 
 [1]
 Without discussion or comment, a three-member panel of the Board adopted the examiner's findings, conclusions and recommendation. So we must turn to the latter's decision to ascertain the findings and conclusions which the Board adopted as its own
 
 
 [2]
 The "prior case" is discussed later in this dissent
 
 
 [3]
 Which for some reason not stated was not issued until April 15, 1964
 
 
 [4]
 Concurring in part in May Dept. Stores Co. v. National Labor Relations Board, 326 U.S. 376, 398, 66 S.Ct. 203, 216, 90 L.Ed. 145 (1945)