**SIGN AND PICTORIAL UNION LOCAL 1175, BROTHERHOOD OF PAINTERS, DECORATORS AND PAPERHANG-ERS OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Webster Outdoor Advertising Co., Intervenor.**

No. 22274.

United States Court of Appeals District of Columbia Circuit.

Argued June 3, 1969.

Decided Sept. 23, 1969.

As Amended Oct. 23, 1969.

Mr. William B. Peer, Washington, D. C., with whom Messrs. Seymour A. Gopman, Miami Beach, Fla., and David S. Barr, Washington, D. C., were on the brief, for petitioner.

Mrs. Marjorie S. Gofreed, Attorney, National Labor Relations Board, of the bar of the Court of Appeals of Maryland, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Glen M. Bendixsen, Attorney, National Labor Relations Board, were on the brief, for respondent. Mr. Jonathan M. Marks, Attorney, National Labor Relations Board, also entered an appearance for respondent.

Mr. Ray C. Muller, Miami, Fla., for intervenor.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.

ROBB, Circuit Judge:

This is a petition to review and set aside a final order of the National Labor Relations Board. The parties have stipulated that the only issue presented is whether the Board properly refused to find the Webster Outdoor Advertising Company (the Company) bargained in bad faith in violation of Section 8(a) (5) and (1) of the National Labor Relations Act, as amended. 29 U.S.C. Secs. 158(a) (5), 158(a) (1) (1964).[1]

The challenged decision and order of the Board rejected a finding by a trial examiner, after hearing on a complaint, that the Company had violated the Act by bargaining in bad faith. The Board accordingly dismissed the complaint. Petitioner (the Union), requests the Court to remand the case to the Board with instructions to enter an appropriate bargaining order consistent with the trial examiner's recommended order. In the alternative, the Union requests the Court to remand to the Board with instructions to articulate its reasons for departing from previous Board precedent or, if unable to do so, to follow that precedent and sustain the trial examiner's decision.

Finding substantial evidence in the record as a whole and ample justification in law to support the Board's conclusion, we deny the Union's petition for review.

## I. THE FACTS

Webster Outdoor Advertising Company is engaged in the manufacture and sale of outdoor billboards and in providing outdoor advertising space in Miami, Florida. It has about twenty-five employees who are generally grouped into two categories: (1) sign painters and helpers and (2) crewmen who erect and rotate the signs. For eighteen years, the painters and helpers were represented by petitioner Union under successive collective bargaining agreements. The bargaining relationship terminated in 1965 when the employees, of their own volition, withdrew from the Union. In June 1966, pursuant to an election con-

---

1. The relevant portions of Section 8(a) provide:

> "It shall be an unfair labor practice for an employer—
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

> \* \* \* \* \*
> (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."
> 29 U.S.C. Sec. 158(a) (1964).

ducted by the Board, the Union was certified as collective bargaining agent for the Company's employees, crewmen as well as painters and helpers.

On July 19, 1966, the first collective bargaining session between the parties was held, and the Union submitted its proposals to the Company in the form of a written contract. Through a series of bargaining sessions, agreement was reached on a number of the Union's demands, but the Company continually rejected proposals for an apprenticeship program, health and welfare fund, and checkoff of dues. In particular, it rejected the Union's substantial across-the-board wage demands, characterizing them as "ridiculous", and counterproposed a four cent an hour increase for crewmen only. Unable to reach agreement, the Union voted to strike, and the strike commenced on September 19, 1966.

Meetings between the parties were held during the strike. At one meeting on November 12, 1967, the Company stated that it had no intention of rehiring any employee who had engaged in strike violence and proposed the establishment of a preferential hiring list for the others. The Union countered that it had information that strike replacements were receiving higher wages and bonuses that had not previously been paid to striking employees. It asked to see the Company payroll records, a request which the Company at first rejected. By subsequent letter, the Company softened its position, but indicated its reluctance to furnish such a list without some assurance that the information was necessary and that it would not be used "to further facilitate harassment of replacements." The Union failed to respond to this letter and did not renew its request for the information. A final

meeting was held by the parties on January 31, 1967, at which time the Company stood on its original offer of a four cent wage increase to crewmen only and insisted on a preferential hiring list for returning strikers. In response to a question from the federal mediator, Company attorney Muller stated that there was no sense in negotiating any further.

On the basis of these facts and the allegedly unlawful unilateral changes instituted by the Company after the commencement of the strike, the Union filed unfair labor practice charges with the Board. Following the issuance of a complaint and a hearing, the trial examiner issued a decision in which he found that the Company had not bargained in bad faith prior to the strike, but that it had engaged in a number of actions after the commencement of the strike which were unilateral in nature and which violated Section 8(a) (5) and (1) of the Act. The trial examiner found that after the strike began the Company supplied work clothing to all replacements in its employ, paid a hurricane bonus to four employees who supervised a crew which prepared the Company's signs to withstand an approaching hurricane, and paid higher wages to a replacement than it had paid to a striking employee. Since the Company had not consulted the Union before taking any of these steps, the trial examiner concluded that the Company had unilaterally altered working conditions in violation of the Act. He also found that the Company's refusal to permit the Union to examine the Company's payroll records was a violation of Section 8(a) (5), and that this activity, the Company's alleged intransigence in its post-strike bargaining, and two statements made during the negotiating sessions,[2] were motivated by

2. On October 10, 1966, Company General Manager Webster told the Union delegation that he "wasn't going to sign no contract, [that] this wasn't the North * * * [and] that he would replace all of the employees." (Tr. Exam. Dec'n., J.A. 355) At the last meeting between the parties on January 31, 1967, Com-

pany attorney Muller stated that the Company was satisfied with the replacement employees which it had then, that there would be another election in June and at that point "it'll be all over and no sense negotiating any more, it will be all over in June." (Tr. Exam. Dec'n., J.A. 357)

a desire to defeat rather than to promote an agreement. The trial examiner concluded that the Company's entire course of conduct after the strike was lacking in a good faith desire to arrive at a final agreement in its negotiations with the Union and that this conduct violated Section 8(a) (1) and (5) of the Act.

Upon exceptions by the Company and the Board's General Counsel to the trial examiner's decision, the Board found, in agreement with the examiner, that the Company did not bargain in bad faith prior to the strike. Unlike the trial examiner, however, the Board concluded that the Company did not engage in bad faith bargaining at any subsequent time. In reaching this conclusion, the Board rejected the examiner's findings that issuance of free work uniforms, granting of hurricane bonuses, and payment of $2.75 an hour to a replacement boom operator constituted unilateral changes in working conditions in violation of Section 8(a) (5) and (1) of the Act. Also contrary to the trial examiner's conclusion, the Board found that the Company's refusal to permit the Union to examine its payroll records, pending assurances that information gained thereby would not be used in harassing replacement workers, did not constitute a categorical refusal to furnish information and did not impede the bargaining process. Accordingly, the Board dismissed the complaint in its entirety.

## II. PRE-STRIKE NEGOTIATIONS AND CONDUCT [3]

Section 8(d) of the National Labor Relations Act defines the duty to bargain as the mutual obligation " * * to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, * * * " 29 U.S.C. Sec. 158(d) (1964). This statutory standard contemplates a willingness to enter into discussions with an open mind and a sincere intention to reach an agreement consistent with the respective rights of the parties. N.L.R.B. v. Texas Coca-Cola Bottling Co., 365 F.2d 321, 322 (C.A. 5, 1966). However, the collective bargaining obligation does not compel either party to agree to a proposal or require the making of a concession. 29 U.S.C. Sec. 158(d) (1964); United Steelworkers of America, AFL-CIO v. N.L.R.B., 124 U.S.App.D.C. 143, 147, 363 F.2d 272, 276, cert. den. 385 U.S. 851, 87 S.Ct. 90, 17 L.Ed.2d 80 (1966). Thus, while a party may not come to the bargaining table with a closed mind, neither is he bound to yield any position fairly maintained; "firmness of a bargaining position does not constitute bad faith." Dallas General Drivers, etc., Local 745 v. N.L.R.B., 122 U.S.App.D.C. 417, 419, 355 F.2d 842, 844 (1966). In each instance the degree of cooperation which a party must show is "largely a matter for the Board's expertise." Fruit & Vegetable Packers and Warehousemen Local 760 v. N.L.R.B., 114 U.S.App.D.C. 388, 389–390, 316 F.2d 389, 390–391 (1963). Where, as here, the Board finds that an employer has fulfilled his obligation, its determination will be upheld unless it is "irrational or unsupported by substantial evidence." Oil, Chemical & Atomic Workers Intern. Union, Local 4–243 AFL-CIO v. N.L.R.B., 124 U.S.App.D.C. 113, 116, 362 F.2d 943, 946 (1966). See 29 U.S.C. Sec. 160(f) (1964); Universal

3. The Board questions whether the Union can raise in this Court the issue of bad faith as it relates to check-off, health and welfare, and apprenticeship training, since it filed no exceptions to the trial examiner's determinations on these matters. Citing N.L.R.B. v. Local 138 International Union of Operating Engineers, 293 F.2d 187 (C.A. 2, 1961), the Union responds that where a party is victorious before the trial examiner with respect to his recommendations, that party should not be compelled to file exceptions to erroneous findings of the examiner which do not affect the ultimate result. Concluding as we do that there is substantial evidence to support the Board's findings in any event, we do not have to resolve the important legal question as to when a party is required to file exceptions in order to preserve his rights.

Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). "The responsibility for determining the existence of substantial evidence in the record to support the findings and orders of the Board thus rests with the Court of Appeals, but the findings of the Board and the Trial Examiner, especially when, as in the instant case, they concur, are not lightly to be disregarded." [4] International Union, etc., UAW v. N.L.R.B., 129 U.S.App.D.C. 196, 200, 392 F.2d 801, 805 (1967), cert. den., Preston Products Co. v. N.L.R.B., 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968).

▪ Applying these principles to the facts of this case, we conclude that there is substantial evidence in the record to support the Board's finding that the Company's pre-strike conduct contained none of the elements customarily connected with bad faith bargaining. For eighteen years, the Company and the Union had negotiated collective bargaining agreements covering the Company's painters. When the Union was certified in June 1966 as the representative of a broader unit containing both painters and crewmen the Company met with the Union on six occasions in a two-month period and expressed its readiness to reestablish a bargaining relationship. It adopted a number of the proposals made by the Union, including union access to the plant and job sites, superseniority for the steward, a joint union-management safety investigation, and a multi-step grievance procedure coupled with binding arbitration. During negotiations, the Company explored the Union's demands and presented serious counterproposals, explaining the reasons underlying its positions and in some instances succeeding in narrowing the area of disagreement. Such conduct constituted a good faith effort to succeed at collective bargaining.

The Union argues that the Company's lack of good faith prior to the strike is demonstrated by its position on the wage issue. When bargaining began, painters and helpers were receiving wages of $3.80 and $2.70 an hour, respectively; crewmen's rates ranged from $1.35 an hour to $2.70 an hour. The Union proposed classification of crewmen as journeymen sign erectors or journeymen sign builders at wage rates of $3.75 and $4.45 an hour, respectively; premium pay of forty cents an hour for boom operators, sixty cents an hour for leadmen and fifty cents an hour for work at heights of forty feet or more; and an increased wage rate of $4.75 an hour for journeymen sign painters. The Company countered with a four cent an hour wage increase to the crewmen only, a position which it adamantly maintained throughout the negotiations. It also agreed to two hours of reporting pay and made concessions on such non-monetary, but income-related items, as hours of work, restrictions on subcontracting and discharge for cause.

▪▪ The Union contends that the offer of four cents an hour to crewmen was made in bad faith, for the Company "undoubtedly was fully cognizant of the untenable position the Union would be in if it were to accept an offer resulting in a wage increase to only about half the employees. Accordingly, it could make the offer with reasonable assurance that it could not and would not be accepted." Southwest Porcelain Steel Corp., 134 N.L.R.B. 1733, 1744 (1961), enf'd, N.L.R.B. v. Southwestern Porcelain Steel Corp., 317 F.2d 527 (C.A. 10, 1963). See also N.L.R.B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 139 (C.A. 1), cert. den., 346 U.S. 887, 74 S.Ct. 139,

---

4. The Court is not overlooking the fact that the trial examiner and the Board reached different conclusions about the post-strike negotiations and conduct. We are referring in this section of the opinion only to the pre-strike negotiations and conduct, and the quotation from International Union, etc., UAW v. N.L.R.B., 129 U.S.App.D.C. 196, 392 F.2d 801 (1967), cert. den. Preston Products Co. v. N.L.R.B., 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968), applies only to the period of time before the strike began.

98 L.Ed. 391 (1953). However, the facts do not support the Union's contention. There is substantial evidence in the record to support the contrary conclusion that the Company's offer was made in good faith. The crewmen were the lowest paid segment of the work force, there was an obvious disparity between their wages and those of the painters and helpers, and the Union itself had sought larger increases for crewmen than for the others. The Company's refusal to grant any increase to the painters and helpers was based on the reasonable ground that it was already paying more to this group of employees than were any of its competitors. The firmness of the Company's position can be attributed at least in part, to the Union's high demands and its refusal to agree to a no-strike clause. In sum, the Company was not obligated to offer a general wage increase or to acquiesce in any of the union's demands in order to demonstrate its good faith. N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); United Steelworkers of America, AFL-CIO v. N.L.R.B., 124 U.S.App.D.C. 143, 147, 363 F.2d 272, 276, cert. den., H. K. Porter, Inc., Disston Division-Danville Works v. N.L.R.B., 385 U.S. 851, 87 S.Ct. 90, 17 L.Ed.2d 80 (1966). In the circumstances the Board not unreasonably declined to infer bad faith from the fact that the Company's wage offer was insubstantial or that it was limited to one group of employees.

■ We also find substantial evidence in the record to support the conclusions of the trial examiner and the Board that the Company bargained in good faith before the strike on the issues of health and welfare benefits, apprenticeship training, and check-off. So far as the check-off issue is concerned, the case before us differs significantly from the situation which existed in United Steelworkers of America, AFL-CIO v. N.L.R.B., 124 U.S.App.D.C. 143, 363 F.2d 272, cert. den. H. K. Porter, Inc., Disston Division-Danville Works v.

N.L.R.B., 385 U.S. 851, 87 S.Ct. 90, 17 L.Ed.2d 80 (1966), relied upon by petitioner. There was substantial evidence that the Company's refusal to accept a check-off provision was not motivated by a desire to frustrate collective bargaining, but was based upon the fact that a check-off would impose too great a burden on the Company's small clerical staff. Similarly, the Company rejected the Union's health and welfare demands upon the ground that the Company already provided health benefits for its employees; and the apprenticeship program was rejected because the Company believed it was not well-established and would not be successful.

### III. POST-STRIKE NEGOTIATIONS AND CONDUCT

The Union asserts that the Company engaged in a series of unilateral actions on mandatory subjects of bargaining and refused to furnish information on wages and bonuses paid to replacements, all in violation of Section 8(a) (5) and (1) of the Act. 29 U.S.C. Secs. 158(a) (5), 158 (a) (1) (1964). The Union also contends that the Company was generally guilty of bad faith bargaining in the post-strike negotiations. The trial examiner agreed and found that the Company had bargained in bad faith after the commencement of the strike. The Board found to the contrary, concluding that there were no violations of Section 8(a) (5) and (1) after the strike began. We conclude that the record as a whole fully supports the Board's determination that the Company did not violate its bargaining obligation after the commencement of the strike.

■ At the outset we dispose of the Union's contention that there is some special significance in the fact that the trial examiner reached one conclusion regarding post-strike negotiations and conduct while the Board reached another. The Union argues first that the Board erred in failing to accord proper weight to the trial examiner's credibility resolutions. Secondly, it contends that since there was substantial evidence in

the record to support the trial examiner's findings and conclusions of law, the Board should be directed to enter an order consistent with the trial examiner's recommended order. But the Union in urging this second contention misapprehends the law. While the Court must sustain the Board's determination if upon the entire record it is supported by substantial evidence, 29 U.S.C. Sec. 160(f) (1964); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the relationship between the Board and its examiner is quite different. The question "is not whether there is substantial evidence to support the trial examiner's findings, * * * but the legal adequacy of the Board's decision which differs from his." Retail Store Employees Union, Local 400 v. N.L.R.B., 123 U.S.App.D.C. 360, 361, 360 F.2d 494, 495 (1965). Since the Board is the agency entrusted by Congress with the responsibility for making findings under the statute, "it is not precluded from reaching a result contrary to that of the Examiner when there is substantial evidence in support of each result." Oil, Chemical & Atomic Workers Intern. Union, Local 4–243 v. N.L.R.B., 124 U.S.App.D.C. 113, 115–116, 362 F.2d 943, 945–946 (1966). "This is not to say that the contrary conclusion drawn by the trial examiner was itself unreasonable. Often a set of facts will supply substantial evidence for either of two conflicting conclusions. In such instances, Congress has decided that the Board's inference shall control", International Union of Electrical, Radio & Machine Workers, AFL-CIO v. N.L.R.B., 135 U.S.App.D.C. 355, at 358, 418 F.2d 1191, at 1194 (July 22, 1969). In exercising its judgment on undisputed facts the Board owes "no deference to its trial examiner", Food Store Employees, Local

347, etc. v. N.L.R.B., No. 21,939 (D.C. Cir., June 3, 1969) slip op. at 5–6; the Board is free to substitute its judgment for the examiner's, although of course it is desirable that the basis of disagreement be made clear. The Board's rejection of the conclusions of its trial examiner when the facts are undisputed will ordinarily not be disturbed on judicial review. International Union of Electrical, Radio & Machine Workers, AFL-CIO v. N.L.R.B., 127 U.S.App.D.C. 303, 305 n. 2, 383 F.2d 230, 232 n. 2 (1967), cert. den., Scott's, Inc. v. N.L.R.B., 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed. 2d 871 (1968); Wheeler v. N.L.R.B., 114 U.S.App.D.C. 255, 258, 314 F.2d 260, 263 (1963).

■ As for the Union's argument that special deference was owed by the Board to its examiner's credibility determinations we do not agree that the different results reached by the examiner and the Board turned significantly on findings as to credibility. Rather the Board drew different inferences and conclusions than did the examiner from the established facts. Food Store Employees, Local 347, etc. v. N.L.R.B., No. 21,939 (D.C. Cir., June 3, 1969) slip op. at 5–6; American Federation of Television & Radio Artists, etc. v. N. L. R. B., 129 U.S.App.D.C. 399, 405, 395 F.2d 622, 628 (1968). See also Oil, Chemical & Atomic Workers Intern. Union, Local 4–243 v. N.L.R.B., 124 U.S.App. D.C. 113, 116, 362 F.2d 943, 946 (1966).

### A. Alleged Unilateral Changes in Wages and Working Conditions [5]

#### 1. WAGES

■ The Union contends that in three instances the Company unilaterally

---

5. The Court recognizes that some of the cases cited in this section of the opinion involve unilateral changes made after an "impasse" in negotiations had been reached, and that certain unilateral changes are permissible after impasse that would constitute unfair labor practices absent an impasse. See, e. g., American Federa-

tion of Television & Radio Artists, etc. v. N.L.R.B., 129 U.S.App.D.C. 399, 401, 395 F.2d 622, 624 (1968); Dallas General Drivers, etc., Local 745 v. N.L.R.B., 122 U.S.App.D.C. 417, 420, 355 F.2d 842, 845 (1966). Here the Board did not find that an impasse had been reached. Rather, it concluded that the Company

granted higher wages to strike replacements in violation of Section 8(a) (1) and (5) of the Act. These wage changes were payment of $2.75 rather than $2.70 an hour to two painter helpers who were brought in on a temporary basis the second day of the strike and quit the same day, a twenty-five cent wage increase given to crewman Willett late in October, and a higher $2.75 an hour wage rate paid to replacement boom operator Rogers. However, we conclude that the Board acted reasonably in finding none of these to be unlawful. Evidence of a five cent overpayment to the painter's helpers, attributable to a clerical error, is, as stated by the trial examiner "hardly more than the proverbial scintilla." The record also shows that the twenty-five cent an hour increase paid to crewman Willett was given to him in contemplation of his promotion to leadman status.

■ The higher $2.75 rate paid to Rogers merits greater consideration. The trial examiner found that Rogers was hired as the replacement for the striking Mitchell who had earned only two dollars an hour. The Board disagreed, finding that Rogers was not Mitchell's replacement, but that he was hired specially to operate the boom. There is substantial evidence in the record to support this conclusion. The evidence shows that before the strike the Company had no formal system of job classifications for crewmen and often interchanged these employees at will. Under this practice Mitchell at one time did gardening and general maintenance work in addition to his other duties. The fact that Mitchell was devoting substantially all of his time to the boom operation just before the strike does not alter his continuing status as an all-around crewman, nor does it compel a conclusion that Rogers was in fact the replacement for Mitchell.[6] The record indicates, on the contrary, that strike replacement Rogers, an experienced boom operator, was hired specially to operate the boom.

When the strike began and all four of the men trained to operate the boom joined the strike, the Company lacked the time and the personnel necessary to train a new boom operator as it ordinarily would have done. In order to continue its business, it was obliged to hire an experienced boom operator at a wage commensurate with his skill. That such a replacement was not readily available is evidenced by the hiring of Rogers at $2.75 an hour, notwithstanding that he was partially incapacitated and interested only in temporary work. His employment at five cents an hour more than had previously been paid any man who had operated the boom was a legitimate attempt by the Company to meet a compelling business need and was justified by valid considerations. Cf. N.L.R.B. v. Tom Joyce Floors, Inc., 353 F.2d 768, 772 (C.A. 9, 1965). It was "designed to meet some temporary or transient need rather than to alter permanently the basic structure of the enterprise." Puerto Rico Telephone Co. v. N.L.R.B., 359 F.2d

---

did not unilaterally alter working conditions in violation of Section 8(a) (1) and (5). Since the alleged unilateral wage changes, the hurricane bonuses and the furnishing of work uniforms did not constitute unlawful unilateral changes, there was no need to make a finding that an impasse existed. The changes made here resulted from temporary or emergency needs, permitting the Board to excuse them as insignificant matters not designed to affect the basic bargaining relationship. Cf. United Steelworkers, etc., Local 5571 v. N.L.R.B., 130 U.S. App.D.C. 369, 373, 401 F.2d 434, 438 (1968); Puerto Rico Telephone Co. v.

N.L.R.B., 359 F.2d 983, 987 (C.A. 1, 1966).

6. There is no conflict between the Board and the trial examiner regarding the credibility of Mitchell's testimony that he worked exclusively on the boom operation "just before" the strike. Notwithstanding Mitchell's testimony the Board found that he had not been permanently and exclusively assigned to operation of the boom, on the basis of other evidence that the Company customarily moved employees from job to job and that Mitchell retained the uniform given him because he did landscaping work around the signs.

983, 987 (C.A. 1, 1966). Moreover, the reduction of Rogers' wages to $2.70 an hour after about four weeks, when he indicated his willingness to stay on permanently, brought his wages into line with the established crewmen's rates. Recognizing that where unilateral wage action of this kind is shown the inferences to be drawn from the evidence must be left to the Board, N.L.R.B. v. Tom Joyce Floors, Inc., 353 F.2d 768, 772 (C.A. 9, 1965), we defer to the Board's conclusion that in the circumstances here described one isolated wage increase during negotiations cannot be characterized as an unfair labor practice probative of bad faith. See N.L.R.B. v. Fitzgerald Mills Corp., 313 F.2d 260, 268 (C.A. 2), cert den., 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963).

## 2. HURRICANE BONUSES

In the first three weeks of the strike, the Company secured replacements for virtually all of its employees. Four of the replacements, Fred and Roger Frost, Robert Lannum and Donald Willett, who had previously worked for the Company as crewmen, were hired at their old wage rates of $1.50 an hour and were among the lowest paid of the replacements. The other replacements were new at the job, many of them being untrained migrant workers. On October 4, the Company's billboards were threatened by a hurricane. The Frosts, Lannum and Willett took the novice employees out to secure the billboards, directed their work and successfully prepared the billboards to withstand the storm. In appreciation, the Company gave each of the four a twenty-five dollar bonus. The Union's argument that this was a unilateral change constituting an unfair labor practice was accepted by the trial examiner but was rejected by the Board.

Although it is true that hurricane alerts are not uncommon in Miami and the Company had never before granted a hurricane bonus, the Board found it significant that the Company had not previously been confronted with a shortage of trained employees

under such emergency conditions. It thus not unreasonably concluded that the unilateral granting of a bonus to a few employees under such unusual conditions did not violate Section 8(a) (1) or (5). A struck employer clearly has the right to keep his business operating, Hawaii Meat Co. v. N.L.R.B., 321 F.2d 397, 400 (C.A. 9, 1963), and often emergency situations justify emergency responses, particularly in the midst of a strike. Cf. N.L.R.B. v. Abbott Publishing Co., 331 F.2d 209, 213 (C.A. 7, 1964). The payment of a twenty-five dollar bonus to the Frosts, Lannum and Willett for their outstanding action in the wake of an emergency threatening the Company's business was "a small matter resulting from 'circumstances which the Board could or should accept as justifying or excusing unilateral action.'" United Steelworkers, etc., Local 5571 v. N.L.R.B., 130 U.S.App.D.C. 369, 373, 401 F.2d 434, 438 (1968), quoting from N.L.R.B. v. Katz, 369 U.S. 736, 748, 82 S. Ct. 1107, 8 L.Ed.2d 230 (1962). It was prompted by a desire to meet a temporary emergency need rather than by an effort permanently to alter the relationship between the Company and the Union. Cf. Puerto Rico Telephone Co. v. N.L.R.B., 359 F.2d 983, 987 (C.A. 1, 1967).

## 3. WORK UNIFORMS

Before the strike the Company did not supply uniforms or work clothing to any employees except those who worked around the plant and came into contact with the public. During negotiations, the Union proposed that free uniforms be provided for all employees. The Company at first objected, saying that employees should continue to provide their own work clothes. Later the Company countered with an offer to provide work uniforms if and when required. The Union rejected this counterproposal. After the strike commenced and many of the replacements, largely unskilled migrant workers, were unable to afford the kind of clothing that the Company considered necessary in

order that they might make a presentable appearance, the Company began supplying uniforms to all of its employees.

The Union contends that the Company's proposal to provide uniforms to its employees at such time as they were needed was tantamount to a flat refusal to recognize the Union's right to negotiate on this subject, and that its subsequent grant of the benefit constituted "an abrupt about-face in the Company's recent bargaining position." The Board acted consistently with the policies of the Act in finding these contentions to be without merit. The first argument overlooks the fact that implicit in the Company's counterproposal were concessions to the Union, namely, that the Company would not require employees to furnish uniforms at their own expense and that if the uniforms were required they would be furnished free of charge. The second contention overlooks the changed circumstances following the strike, namely, that the impoverished replacements did not make a presentable appearance in their own clothes.[7] In short, the Company made a legitimate offer to furnish uniforms when needed, did not revoke the offer, and acted on that offer under the changed circumstances following the strike. Cf. Caroline Farms Division of Textron, Inc. v. N.L.R.B., 401 F.2d 205, 211 (C.A. 4, 1968). Since the new benefit conferred after the strike was not more favorable to the employees than the offers which the Company had previously extended to the Union at the bargaining table the Board not unreasonably found that by conferring it the Company did not violate Section 8(a) (1) and (5) of the Act. American Federation of Television & Radio Artists, etc. v. N.L.R.B., 129 U.S.App.D.C. 399, 406, 395 F.2d 622, 629–630 (1968). Cf. N.L.R.B. v. Cromp-ton-Highland Mills, Inc., 337 U.S. 217, 225, 69 S.Ct. 960, 93 L.Ed. 1320 (1949).

### B. *Withholding of Payroll Information*

In a letter addressed to the Company on November 15, 1966, counsel for the Union alleged that replacements were being paid higher wages than had been paid the striking employees and were receiving bonuses and other fringe benefits not previously conferred. A demand to inspect the Company's books was made. By letter dated November 18, the Company denied the allegations of higher wages, bonuses and other fringe benefits. It offered to discuss any specific question on how any particular replacement had been treated; but the Company indicated that it was "rather hesitant to turn over to the Union a list of replacements without some assurances that the information is really necessary to the Union and further that it won't be used to further facilitate harassment of replacements." The reference to "harassment" was based upon the fact, established in an uncontested board decision against the Union, that replacements were harassed, threatened and assaulted by some of the striking employees, in the presence of Union representative Martinez. This was at the outset of the strike. See Sign & Pictorial Union, Local 1175, Board Case No. 12–CB–903. One of the strikers was later convicted in municipal court for assaulting a replacement with a gun. The Union did not respond to the Company's letter of November 18.

It is settled that an employer's obligation to bargain in good faith may include the duty to furnish to the Union pertinent information on wages so that the Union may effectively represent the employees. N. L. R. B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed.

---

7. The Union cites Majure Transport Co. v. N.L.R.B., 198 F.2d 735, 739 (C.A. 5, 1952), holding that an employer's uncompromising demand for a contract under which management would "retain the power of unilateral control of each and every feature of the rates of pay, hours of work, and all conditions of employment", went beyond the management prerogative clause held permissible by the Supreme Court in N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). That holding is clearly inapposite here.

1027 (1956); International Woodworkers, etc., Locals 6–7 and 6–122 v. N. L. R. B., 105 U.S.App.D.C. 37, 38, 263 F.2d 483, 484 (1959); N. L. R. B. v. Southland Cork Co., 342 F.2d 702, 706 (C.A.4, 1965). However, "Each case must turn on its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." N. L. R. B. v. Truitt Mfg. Co., 351 U.S. 149, 153–154, 76 S.Ct. 753 (1956). There may be circumstances justifying an employer's refusal to furnish such information or his imposition of conditions upon the production of his records for inspection. Fruit & Vegetable Packers and Warehousemen Local 760 v. N. L. R. B., 114 U.S.App. D.C. 388, 390, 316 F.2d 389, 390 (1963).

In view of the uncontested facts that replacements were harassed, threatened and assaulted by some of the striking employees, the Board found that the Company's refusal to permit the Union to examine its records, pending assurances that the information gained would not be misused, was justifiable and was not such a categorical refusal as would impede the bargaining process. On the whole record, we find 'rational basis for the Board's conclusion that the refusal to supply such information, absent these assurances, did not violate the duty to bargain in good faith.[8]

### C. Alleged "Overall" Bad Faith Bargaining

The Union contends that the Board erred by considering each alleged unlawful act by the Company individually rather than applying the principle that the "totality" of an employer's conduct must be assessed in determining bad faith bargaining. We agree with the Union that the charges against the Company must be viewed in the context of its total conduct. Caroline Farms Division of Textron, Inc. v. N. L. R. B., 401 F.2d 205, 207 (C.A.4, 1968); N. L. R. B. v. Texas Coca-Cola Bottling Co., 365 F.2d 321, 322 (C.A.5, 1966); N. L. R. B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 139 (C.A. 1, 1953), cert. den. 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). But we do not agree that the Board failed to consider the total conduct of the Company and the entire record in reaching its ultimate conclusion that the Company did not act in bad faith. Its seriatim approach, much like that used in this opinion, was merely an effort to set out the facts, the parties' contentions and the Board's conclusions in some orderly fashion. It does not indicate a failure to view the whole record in reaching those subsidiary conclusions and the ultimate conclusion that the Company was not guilty of bargaining in bad faith after the strike began.

Admittedly, the Company engaged in a course of hard bargaining, but firmness of a bargaining position does not constitute bad faith. Dallas General Drivers, etc., Local 745 v. N. L. R. B., 122 U.S.App.D.C. 417, 419, 355 F.2d 842, 844 (1966). Indeed strikes often harden attitudes. Cf. Warehousemen & Mail Order Employees, Local 743 etc. v. N. L. R. B., 112 U.S.App.D.C. 280, 283, 302 F.2d 865, 868 (1962); N. L. R. B. v. Alva Allen Industries, Inc., 369 F.2d 310, 318 (C.A.8, 1966). The Board believed, however, that there was substantial evidence to support its view of

---

8. The Union cites Excelsior Underwear, Inc., 156 NLRB 1236 (1966). It is true that there the Board held that an employer must supply the Union with a list of the employees' names and addresses before an election. It rejected the contention that union harassment of employees at their homes would result. The Union fails to indicate, however, that the Board in the *Excelsior Underwear* case stated that it would not "assume" such union misconduct, and that "if it [occurred], we shall provide an appropriate remedy." *Id.* at 1244. That reasoning supports the Board's action here, for here it is uncontested that such union misconduct did in fact take place.

the totality of the Company's conduct. The Company did meet with the Union at regular intervals after commencement of the strike. Proposals were made by both parties, bargaining demands were explored, some agreements on contract proposals were arrived at, and some areas of disagreement were narrowed. The Company made its officers available to the Union, submitted serious proposals, and did not engage in the dilatory tactics traditionally associated with "surface bargaining." Neither did it foreclose negotiation on any mandatory subject of bargaining or insist on any non-mandatory subject. After the strike began, the Company was insisting on the same proposals which it had lawfully insisted upon prior to the strike.

 Understandably the Company made no additional concessions on wages after the strike was under way, and it elected to stand firm on its pre-strike offer which had been made in good faith. The Company was not obliged to increase its wage offer merely because the Union lowered its demand, particularly where the Union's reduced demand still amounted to a very substantial increase and the Union indicated that it would settle for no less, and where it was claimed, without contradiction, that the Company was already paying wages equal to those being paid by its competitors. See N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952).

In light of the foregoing the statements made by General Manager Webster on October 10, 1966 and by attorney Muller on January 21, 1967,[9] are not sufficient, standing alone, to support a finding of bad faith. "Individual acts or statements of a negotiating party which appear contrary to the required attitude cannot be drawn upon to dilute a finding of good faith where the totality of the party's conduct conforms to the dictates of the statute." N. L. R. B. v. Almeida Bus Lines, Inc., 333 F.2d 729, 731 (C.A. 1, 1964). See also N. L. R. B. v. MacMillan Ring-Free Oil Co., 394 F.2d 26, 29 (C.A.9, 1968), cert. den., Oil Chemical and Atomic Workers of Intern. Union, Long Beach Local No. 1–128 v. N. L. R. B., 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968). Webster's statement that "he wasn't going to sign no contract, [that] this wasn't the North * * * [and] that he would replace all of the employees," seems to refer to the particular contract presented by the Union rather than to an outright rejection of the collective bargaining principle. N. L. R. B. v. Getlan Iron Works, Inc., 377 F.2d 894, 898 (C.A.2, 1967). This is particularly so when considered in the context of what the Board found to be Webster's penchant for blunt overstatement and his repeated assertions that he was pleased with prior contracts with the Union.

## CONCLUSION

The Board's findings that there was good faith bargaining both before and after the commencement of the strike and that there were no violations by the Company of Section 8(a) (1) or (5) of the National Labor Relations Act are based upon substantial evidence in the record as a whole, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and have a reasonable basis in law, N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). The petition for review is therefore

Denied.

---

9. See Note 2.